ORSAMUS BEARDSLEE, ADMINISTRATOR OF THE ESTATE OF
    STEPHEN REEVES, DECEASED, V. GEORGE REEVES.

*Gift—Evidence—Testimony taken on former hearing—Estates of
    deceased persons—Administration—Acquiescence.*

1. Where, on the trial of a suit brought by an administrator for
   the conversion of certain property belonging to the estate as
   alleged, the examination of the defendant, taken in the probate
   court, was introduced to show defendant's admissions of such
   conversion, he is entitled to introduce his *entire* examination, or
   such parts as he deems material, although relating to matters
   equally within the knowledge of the deceased.

2. In a suit involving the right of a son to certain notes and a mort-
   gage, claimed to belong to his father's estate, and which he
   claims to own through a gift to him by his father of *all* of his
   notes and mortgages, a *prior* deed to the son by his father of his
   farm, on certain conditions, as also other antecedent transactions
   of the father looking towards the distribution of his property
   among his children, are admissible in evidence as bearing upon
   the *intent, nature, extent*, and *character* of the *later* disposition
   under which the son claims title.

3. Fourteen years' seeming acquiescence by *adult* children in an
   attempted disposition by their father of his estate, during which
   time no attempt is made to disturb it, will bar administration for
   the purpose of contesting and annulling such division, in the
   absence of creditors.

4. A gift by a father to his son of certain notes and mortgages,
   accompanied by *actual* delivery and *retained* possession, is
   valid, and vests the title to the securities in the son as against
   the heirs of the donor, or the administrator of his estate.

5. The question of the delivery of the notes and mortgages to defend-
   ant to take *present* effect is held to have been properly found in
   favor of the defendant by the jury.

Error to Oakland. (Stickney, J.) Argued June 28, 1889.
Decided October 18, 1889.

Trover for alleged conversion of certain notes and a mort-
gage belonging to the estate. Plaintiff brings error.

Affirmed.    The facts, and points of counsel *passed* upon by the Court, are stated in the opinion.

*Aaron Perry (F. A. Baker,* of counsel), for appellant.

*Baldwin, Draper & Jacokes,* for defendant.

MORSE, J.    January 27, 1871, Stephen Reeves died intestate, leaving surviving him his widow, one son, the defendant, and six daughters.

Stephen Reeves was an old settler and prominent citizen of Oakland county.    He had been judge of probate of the county, and for this reason, or some other, had a deep-seated and bitter prejudice against the administration of estates in that court, and seemed determined, for many years before his death, to so dispose of his property during his life that at his death there would be nothing left of his estate to be administered upon.

His wife died the next fall after his decease.

Three of his daughters lived with him at the time of his death, Amanda, Maria, and Mehitable.    Maria is now dead.

In the summer before his death he attempted to make a disposition of his property.    He was the owner of a farm of 200 acres and considerable personal property.    On the twenty-second day of August, 1868, he conveyed this farm to his son, the defendant, who was a married man with a family.    In this deed he reserved the west half of his residence to the use of himself and his wife during their lives.    And the instrument also contained a condition that his daughters, Amanda, Maria, and Mehitable should be permitted as long as they remained unmarried " to occupy the same rooms in the house they have been accustomed to occupy," and that the defendant during the same time should furnish them with suitable "clothing and a comfortable maintenance."

At the time of the execution of this deed George had been living in one part of the house, and had been carrying on the

farm, in company with his father, for several years. He was living there at the time of his father's death. Mrs. Reeves did not join in the deed, but the record shows that she acquiesced in the arrangement.

In the summer of 1870, according to the testimony of the defendant and the three sisters who lived at home, he delivered to these three girls each a mortgage security as their share of his property, and gave to the defendant all his other notes and mortgages as his share.

It also appears in the record that sometime about 1861 Stephen Reeves made and executed, but did not deliver, six promissory notes, payable at his death, evidently intending the same to be at least a partial distribution of his estate among his children. These notes were for the following sums: To Maria and Mehitable, each $2,000; to Amanda, $500; and to the three married daughters living away from home, Caroline Galloway, Mary Galloway, and Jane Galloway, $200 each.

It is claimed by the defendant that these three notes of $200, at the last division of the property, in 1870, were placed in his hands by his father, to be paid after his death by the defendant.

Mary and Jane were paid $200 each, and receipted for the same, Mary February 9, 1871, and Jane the same date. The receipts were given in form in full of all demands against their father's estate, and released all further claims against the same.

George testified that he also paid Caroline $200, which she denied.

In 1885 administration was granted to the plaintiff upon the estate of Stephen Reeves, and in 1887 this suit was commenced in the Oakland county circuit court, in trover, for the value of three money obligations, called the "Kellam Note," the "Hubbell Note," and the "Bowlby Notes," and

the mortgage which secured them, amounting in all to $1,451.75.

The plaintiff claimed that these notes belonged to Stephen Reeves at the time of his death, and that the defendant had collected them and converted the proceeds to his own use without right.

The defendant claimed that these instruments were given and delivered to him at the time of his father's distribution of his property in 1870, and that they belonged to him, and he had the right to collect and keep the proceeds of the notes as his own. There was no written assignment of the Bowlby mortgage from the father to the son, but the defendant claimed that the notes and mortgage were handed to him by his father to keep and use as his own; that his father intended that the defendant should have all the property, save the mortgages delivered at the same time to the three girls at home, burdened only with the conditions of the deed, and the payment of $200 to each of the three married sisters.

The following assignment was introduced by the defendant, against objection and exception of plaintiff:

"I do hereby assign to my son, George Reeves, all my mortgages, notes, and demands which I may die seized of, to be collected and paid in accordance with the amounts specified in notes to my several children.

"STEPHEN REEVES.

"Pontiac, October 29, A. D. 1869."

Two special questions were submitted to the jury on request of the defendant, both of which were answered "Yes."

"1. Do you find that Stephen Reeves, seven months prior to his death, gave and delivered to his son, George, the defendant, the notes and the mortgage in controversy?

"2. Did defendant receive them, and retain them in his possession, claiming them as his own?"

The jury returned, also, a general verdict for the defendant, upon which judgment was entered in his favor.

The first assignment of error relates to the admission of testimony which is claimed to have been incompetent and inadmissible under How. Stat. § 7545.

It seems that before the trial of this cause the defendant was summoned into the probate court by the administrator to answer interrogatories as to his disposition of this property in dispute. His examination in that court was taken down by a stenographer.

This stenographer, Mr. Hicks, was called as a witness by the plaintiff, and his minutes read from to prove that defendant, on such examination, testified that he had the Kellam note in his possession, and that he received the money on the Bowlby mortgage.

On cross-examination the witness was asked by defendant's counsel if defendant did not state on that examination that his father, before he died, gave and delivered this mortgage to him, to which question, under objection, he answered "Yes."

It is contended that this was testimony of a fact equally within the knowledge of his father, now deceased, and consequently barred by the statute above noted. We think the testimony, under the circumstances, was admissible. It would seem that upon the inquisition in the probate court the disability of the defendant to testify under this statute was waived by the plaintiff. But, whether this was so or not, if any part of such examination was used by the plaintiff in the circuit court, the defendant was entitled to the whole of his testimony given on such examination, or such parts thereof as he deemed material. See *Smith's Appeal*, 52 Mich. 415 (18 N. W. Rep. 195).

The deed of the land was properly admitted, as were all the antecedent transactions of the deceased looking towards the distribution of his property among his children, as bearing upon the intent, nature, and extent and character of his last disposition, in 1870.

The receipts given by the two girls, and their release of all claims against the estate, were properly put in evidence, as was also the evidence of payment to Caroline, and I think the court could well have directed a verdict for the defendant at the close of the testimony. These receipts were given 16 years before this suit was brought, and administration was not taken upon their father's estate until 14 years after his death. Caroline, the other girl, at the time of her father's death, or at least some of the time between this claimed delivery of these papers by the father to George and the date of his death, lived near by her father. All of them knew, immediately after the death of their father, and were made aware of the fact, that George claimed all the property save the mortgages delivered to the girls at home, and that all he considered to be their share was the $200 each, represented by the notes made in 1861.

Two of them almost immediately accepted the $200, and released their claims. They now contend that they did not know that the receipts were in full of their claims to their father's estate. I am satisfied that the statute of limitations ought certainly to run against them, and think it should against Caroline also.

There are no creditors seeking to collect claims against this estate by administration, but the appointment of an administrator was made solely in the interest of the heirs, all of whom are satisfied, save these three. An interval of 14 years, without any attempt to disturb this attempted disposition by Stephen Reeves of his property, and 14 years of seeming acquiescence of all the children, all of whom were adults at his death, in this division of his estate, ought to, and, in my opinion, does, bar administration of his estate for the purpose of contesting and annulling such division.

The court, in his instructions to the jury, committed no error.

He charged them that if Stephen Reeves gave to the defend-

ant the notes and mortgages in question, and the same were at the time delivered to him, and in pursuance thereof George Reeves took and retained such possession, such gift was valid, and gave him the right and title to them as against the heirs or administrator of his father, the said Stephen Reeves. This was the only material question in the case (the question of gift and delivery), and the jury answered it specially and generally in favor of the defendant.

It was ably and ingeniously argued by plaintiff's counsel that the evidence adduced on behalf of the defendant established the fact that there was no delivery of these securities to George to take a present effect, but that the assignments made in 1869, and the testimony of defendant and his witnesses, show that the gift of these notes and mortgages was not intended to take effect until after his death, and is therefore void; that the delivery was simply a handing of them over to George to take care of them until his death, and then to collect them and make the desired distribution. The jury found otherwise, and, we think, rightfully so.

The intent of the testator that his property should go as it has gone is manifest, and not disputed. There is no claim that he was not in his right mind when he made his last disposition of his property, or that he was unduly influenced by any one.

It is probable that when he executed the notes to his daughters in 1861 he meant to keep his whole estate in his hands until his death, when the notes were to be paid. In 1868 he conveyed, and meant to convey, all his real estate to the defendant, burdened only with the conditions heretofore stated. Why he did this we do not know, and it is none of our concern. There is no fact or showing in the record why he did not have the perfect right to do it.

In 1869 he placed all the notes and mortgages and demands of which he might die seized in the hands of his son, evi-

dently to be collected after his death to pay the notes given in 1861.

But in 1870, realizing or fearing that he might die suddenly (which he did), it is clear that he changed his intention as to his personal property. His real estate was disposed of (no fear of that going into probate), and it only remained for him to arrange his personal property to escape any administration of his estate in the probate court. He therefore called together his children at home, the wife being present, and gave to each of the three girls, not the notes that he had executed in 1861, but mortgages in lieu of them. He delivered to George all the other notes and securities, as his own, subject only to the payment of $200 each to the three married daughters, the same amount which he intended to give them in the first place. Why he gave them only this amount is immaterial as a legal question. He was privileged under the law to cut them off without even the traditional shilling had he so desired, but we find in the testimony that he gave as a reason that they were " well enough off " already, and it is not strange that he gave to the unmarried girls a larger portion than he did to the others, because it is plain they needed more.

The argument that the disposition of his property was unfair and unjust does not strike us as a lawful reason why the plaintiff should recover in this action, nor are we prepared to say that it is sound, under the testimony in the case. George had been married over 20 years when his father died, and had spent the best years of his life in his father's service, or upon this farm. He was burdened with the care and maintenance of his mother, and obligated to provide clothing, shelter, and food (a comfortable living) to his three unmarried sisters while they remained single. It is probable that the father, who evidently was a just man, knew best what division to make that would be most equitable under the circumstances, which he knew best of any one, and the

fact that this division of his property was acquiesced in by all the children for nearly 15 years is pretty good evidence that he did no great wrong to any of them in this disposition of his estate.

The judgment is affirmed, with costs.

The other Justices concurred.