OTTO A. OSWALD

*v.*

WILLIAM G. CALDWELL *et al.*

*Opinion filed December 22, 1906—Rehearing denied Feb. 12, 1907.*

1. DEEDS—*testamentary deed must have the formality of a will.* An intended disposition of property which is testamentary in character and not to take effect until the grantor's death is not operative unless declared in writing, in strict conformity with statutory enactments regulating the making of wills.

2. SAME—*when trust cannot be enforced.* A valid trust, to be executed after the grantor's death, may be created by making a deed absolute in form and specifying the purposes of the trust in a separate instrument, which is either signed by the grantee or the trust otherwise admitted by him in writing; but it must appear that the title vested in the grantee during the grantor's lifetime, otherwise the trust cannot be enforced.

3. SAME—*when deed is not well delivered.* The mere handing of a deed to the grantee by the grantor does not pass title, where it was the intention of the parties that the grantor was not to part with the title during her lifetime, but that after her death the deed, in connection with separate instruments executed by the grantor designating the objects of her bounty, would control the disposition of the property if it had not already been sold.

APPEAL from the Circuit Court of Cook county; the Hon. J. W. MACK, Judge, presiding.

HOLLETT, SAUTER & HENKEL, for appellant.

CUSTER, GRIFFIN & CAMERON, for appellee Caldwell.

CASWELL & HEALY, and VAIL & PAIN, for appellee Anne Paton.

Mr. JUSTICE HAND delivered the opinion of the court:

This was a bill in chancery filed in the circuit court of Cook county by William G. Caldwell, one of the appellees, against the appellant, Otto A. Oswald, the heirs-at-law of Anne Caldwell, deceased, and certain other persons and societies claiming an interest in certain real estate which it is conceded belonged to Anne Caldwell, deceased, prior to the 28th day of January, 1898, and described as lot 1, in block 124, in school section addition to Chicago, to obtain an adjudication by a court of chancery as to the legal effect of a certain warranty deed and two certain instruments in writing executed by said Anne Caldwell purporting to convey said real estate to said William G. Caldwell, and authorizing him to make a sale thereof and to distribute the proceeds arising from such sale among the persons and societies named in said two instruments in writing, after the death of Anne Caldwell.

It is contended by the appellant that a trust was created by said deed, one of said instruments in writing and the admissions of William G. Caldwell made in his bill and in his deposition taken in this case, for the benefit of the persons and societies named in said instrument in writing; while the claim of the appellee Anne Paton, who is the only appellee who has filed a brief in this court, is, that the deed, the two instruments in writing, the admissions in the bill and the testimony of William G. Caldwell show that said deed and two instruments in writing were to take effect only after the death of Anne Caldwell, and were testamentary in their character, and therefore void. Answers and replications

225—15

were filed, and a decree was entered holding that said deed and two instruments in writing were testamentary in their character and had no binding legal force, and that the said real estate was intestate property and descended to the heirs of Anne Caldwell, deceased, and decreeing, according to the alternative prayer of the bill, that said real estate be partitioned between the heirs-at-law of Anne Caldwell, deceased, from which decree Otto A. Oswald has prosecuted an appeal to this court.

The deed bore date January 28, 1898, was in statutory form, recited a consideration of "one dollar in hand paid and other good and valuable considerations," and was signed and acknowledged by Anne Caldwell, and purported to convey to said William G. Caldwell, in fee simple, said premises, which deed on the day of its execution was handed to William G. Caldwell by Anne Caldwell. The first instrument in writing was in the handwriting of Anne Caldwell, and was signed by her and was handed by her to William G. Caldwell on February 10, 1898, and is as follows:

"William G. Caldwell, my youngest son: If God sees fit to take me to himself before my property in Chicago is sold, I authorize you, my son, to sell it when you see fit and divide it as I direct you. This is my wish while I am in health and the possession of my faculties, that you shall do as I desire you, your mother, Anne Caldwell.

"One thousand dollars, the interest of it to pay for the support of the gospel yearly of the Presbyterian church in Chicago Heights; $1000, the interest of it to keep in repair the cemetery at the Presbyterian church in Chicago Heights; $1000 to be given to the Woman's Temple in Chicago; $500 to the Moody Institute in Chicago; $500 to the Young Men's Christian Association in Chicago; $500 to the S. S. school library of the Presbyterian church in Chicago Heights; $500 to the Methodist church in Chicago Heights; the rest to be divided into equal parts. Four parts to be given to my daughter Susan Caldwell; two parts to be given to my

daughter Mary I. Oswald; two parts to be given to my son Joseph R. Caldwell; two parts to be given to my son William G. Caldwell; one-half part each to my sister Nancy Millar, Ella C. Caldwell, Jennie Caldwell, John Paton, Otto Oswald, Anne Paton, Harry Lind Caldwell and Mildred Caldwell.

"My son, William George Caldwell, do this in the fear of God, so He may give you wisdom to guide you in the right disposing of this trust. After paying all expenses, if I have any money in the bank at my death, I give it to my daughter Susan. I have already given the house and its contents, also the barn and its contents, to my daughter Susan Caldwell. Also whatever notes I may have at my death I give to Susan Caldwell."

Mary I. Oswald, the daughter of Anne Caldwell mentioned in the foregoing instrument in writing, died testate subsequent to its execution, and shortly after her death Anne Caldwell executed a second instrument in writing relative to the distribution of her estate after her death, which instrument in writing was in her handwriting and was also handed to William G. Caldwell shortly after it was written. That instrument reads as follows:

"Willie G. Caldwell: Since I wrote the arrangement of the disposition of my property, your sister, Mary I. Oswald, has died. So do you *give her share* to educate the Cuban children, and in case of the death of any other of my family spoken of in this paper, let their share be divided equally between each of my living children living at the time the property is sold. Let the rent after my death be given in equal parts to Joseph, William and Susan. In case the women lose the Temple, let that share be given to educate the black children in the south."

Anne Caldwell died intestate in June, 1900. Otto A. Oswald is the husband of and sole legatee and devisee of Mary I. Oswald, deceased. Anne Paton is a child of a deceased daughter of Anne Caldwell, and a minor.

In the bill filed by William G. Caldwell he averred "that in the belief and opinion of your orator it was the intention of the said Anne Caldwell to create in and by the said papers [the deed and two instruments in writing] a trust or trusts for the several beneficiaries named therein. * * * And your orator is desirous that the said trusts shall be published and declared and established if the same are valid and if the same may be lawfully executed and carried out." And the only evidence which bears in any way upon the execution of said deed and instruments in writing by Anne Caldwell and their delivery to William G. Caldwell, and the reasons which led to their execution, is found in the testimony of William G. Caldwell, who testified fully, and without objection as to his competency as a witness, to the execution of said deed and instruments in writing, and the conversations which took place prior and subsequent to their execution between himself and his mother, and the motives which prompted his mother to execute said deed and instruments in writing and place them in his hands. The testimony of William G. Caldwell was taken in the form of a deposition, and is so important to a proper decision of this case that we feel justified in inserting in this opinion the following excerpts therefrom:

Q. "The day this deed was made, was the notary public at your house before your mother?

A. "No, sir.

Q. "Who sent for him?

A. "I did.

Q. "How did you come to send for him?

A. "Because my mother came to the house and I wrote out the deed, and I did not want her to go down town, and I told her the notary would come to the house.

Q. "How did you come to write out the deed?

A. "She asked me to.

Q. "What was said at the time she asked you to?

A. "Well, she had been sick considerable before that and she did not think at that time she would live very long,

and she wanted to dispose of her property, or fix it in some way so it would be taken care of in the event she died. We talked of making a will, and she didn't want to do that because it would have to go through court then.

Q. "The notary was there for the purpose of taking the acknowledgment?

A. "Yes, sir.

Q. "And then what became of the deed?

A. "I had it.

Q. "Your mother gave it to you?·

A. "Yes, sir.

Q. "And what did you do with it?

A. "I put it in the vault in a box.

Q. "In your personal box?

A. "Yes, sir.

Q. "And from that time until it was finally recorded [which was after the death of his mother] it was in your possession all the time, was it?

A. "Yes, sir.

Q. "At the time the deed was delivered to you did your mother have any talk with you in reference to what she wanted done with the property?

A. "Yes, sir; she had before that; maybe not right at. the time; she had before the deed was made.

Q. "Before that she had talked over what disposition she wanted made of the property?

A. "Yes, sir.

Q. "And that she would deed it to you so you could handle the sale of it and make the division as she wanted it made?

A. "Yes.

Q. "Was it your understanding at that time that this deed was made and executed and delivered by your mother to you to carry out her intention, which she had then or prior thereto expressed to you as what she wanted done with the proceeds of the property derived through a sale?

A. "She told me that she would write down what she wanted me to do with the property if it was sold.

Q. "So at the time she told you that she would give the deed to you and would write down what she wanted done with it when you sold it; is that right?

A. "That is, if I sold it after her death; if I sold it beforehand I would have to account to her for the property.

Q. "So it was your understanding, was it not, that this deed was given to you then upon the trusts expressed in this instrument at that time?

A. "Well, she did not give me the paper until after she gave me the deed.

Q. "And when you got it, it was your understanding at the time you got this that the deed was given to you upon the trusts expressed in Exhibit B? (Paper delivered February 10, 1898.)

A. "If I sold the property after she died.

Q. "After the execution of this deed did you collect the rent of the premises personally?

A. "Yes, sir.

Q. "Had you been doing that before the execution of the deed?

A. "Yes, sir.

Q. "What disposition did you make of the rents, both before and after the execution of the deed?

A. "I paid the taxes on the place; if there was any repairs I paid the repairs; the balance of the money I turned over to my mother.

Q. "Both before and after the execution of the deed?

A. "Yes, sir.

Q. "Was there any difference in your handling of the rents or issues or profits of that property before the death of your mother, after the execution of the deed?

A. "No, it was just the same before and after.

Q. "Did you accept the deed from her?

A. "Well, she handed it to me.

Q. "What did you accept it for, if you did accept it?

A. "Simply to do as she wanted me to do with the property.

Q. "You may state whether, at the time or after you accepted this deed, you have ever regarded yourself as the owner of that property.

A. "No, sir."

The law is well settled that if the intended disposition of property is of a testamentary character and not to take effect in the testator's lifetime but is ambulatory until his death, such disposition is not operative unless it be declared in writing, in strict conformity with the statutory enactments regulating the making of wills. (*Bovee* v. *Hinde,* 135 Ill. 137; *Hayes* v. *Boylan,* 141 id. 400; *Oliver* v. *Oliver,* 149 id. 542; *Rountree* v. *Smith,* 152 id. 493; *Wilson* v. *Wilson,* 158 id. 567; *Hollenbeck* v. *Hollenbeck,* 185 id. 101; *Wilenou* v. *Handlon,* 207 id. 104; *Noble* v. *Tipton,* 219 id. 182.) The deed made by Mrs. Caldwell to her son was absolute in form, and if she handed it to him after its execution with the intention that the title to said premises should immediately vest in him and he accepted the deed, Mrs. Caldwell did not die seized of an estate of inheritance in said real estate.

We have no question but that a party may make and deliver an absolute deed to real estate, intending thereby to divest himself of title, with the understanding with the grantee that he will sell and dispose of the real estate so conveyed, subsequent to the death of the grantor, and divide the proceeds arising from such sale between such persons as the grantor may subsequently designate in writing or by will, and that if such trust is evidenced by an independent writing signed by the grantee, or is admitted by the grantee in a writing signed by him, as it was in this case, the trust will be enforced in equity. It must, however, appear that the title to the real estate vested in the grantee during the life of the grantor, and if such fact does not appear the trust would not be enforced. In this case the grantor was seventy-one years

of age and the mother of the grantee. She did not want to make a will, but wanted to arrange her property, as she thought she might not live long, so that it would, in case of her death, in part go to certain persons or societies other than her heirs. To accomplish that purpose she made a deed and handed it to her son, who did not record it but placed it in a box in a safety deposit vault, where it remained until after her death. She received the net income of the property after the deed was made, the same as she had before. The property was insured in her name. The son paid the taxes, also for repairs, out of the gross receipts from the property. There was no apparent change in the ownership or possession of the property, but the son handled the property for the benefit of his mother after the deed was made the same as he had before that time. After the deed was made the mother designated in writing who her beneficiaries should be in case of her death, and provided: "If God sees fit to take me to himself before my property in Chicago is sold, I authorize you, my son, to sell it when you see fit,"— which clearly shows she did not understand she had surrendered dominion over her property to her son so long as she should live; and the son testified it was not thought he would sell the property prior to his mother's death, but if it was sold the proceeds would go to her. The son also states that he did not claim the property, and that the deed was only made so that he could carry out the wishes of his mother. Mrs. Caldwell sought to change the beneficiaries named in the paper handed to her son on February 10 by a subsequent paper; and he recognized her right to make the change. From all of these facts we are impressed with the view that the disposition of the property was testamentary.

It is said, however, the deed was delivered to the son by his mother and that by such delivery the title vested in the son, and that Mrs. Caldwell, by the paper handed to her son on February 10, designated the objects of her bounty, and thereby the trust was executed and could not be changed by

her thereafter. The fact that the deed was handed to the son did not necessarily vest the title to the property in him. In *Wilson* v. *Wilson, supra,* on page 574, it was said : "The mere placing of the deed in the hands of one of the grantees did not, of itself, necessarily constitute a delivery. In such a case the inquiry is, what was the intention of the parties at the time?—and that intention, when ascertained, must govern." And in *Oliver* v. *Oliver, supra,* on page 547: "The fact that a grantee in a deed may, after the execution of the instrument, take it into his hands, does not, of itself, establish a delivery." And in *Hollenbeck* v. *Hollenbeck, supra,* on page 103: "The mere placing of a deed in the hands of the grantee does not conclusively establish a delivery thereof, within the legal meaning of that word. Delivery is a question of intent, and depends upon 'whether the parties at the time meant it to be a delivery to take effect at once.' "

We think a careful reading of this record shows that the intention of the parties was that the deed and the two instruments in writing above set forth should take the place of and operate as a will, and that the circuit court properly so held. Had William G. Caldwell, in the face of the admissions made by him in his bill and answer, claimed the absolute title to said premises as against his brother and niece, there could be no question but that a court of chancery would, in view of the foregoing authorities, hold that the deed was not delivered to him with the intention of passing the absolute title to said premises to him, and would have set it aside. In the *Wilson case, supra,* the grantor delivered the deed to one of the grantees with the understanding if the grantor did not call for it it was to be placed of record after his death, and in the *Rountree case* the deed was delivered by the grantor to the grantee and recorded with the knowledge and consent of the grantor, and yet it was held in each of those cases that the deed was not delivered so as to vest title.

Finding no reversible error in this record the decree of the circuit court will be affirmed.                    *Decree affirmed.*