JOHN WARD, Plaintiff in Error, *vs.* JAMES CONKLIN *et al.* Defendants in Error.

*Opinion filed February 20, 1908.*

1. DEEDS—*what constitutes a valid delivery.* While the mere manual transfer of a deed between grantor and grantee does not, in the absence of any intention to presently vest title, constitute a valid delivery, yet if such intention accompanies the transfer the delivery is valid and title vests in the grantee, even though by subsequent arrangement the deeds are returned to the grantor, who retains them and controls the property until his death.

2. SAME—*rule as to presumption of delivery in case of voluntary settlement.* In cases of voluntary settlement by deed the presumption in favor of delivery is stronger than in ordinary cases of conveyance for valuable consideration.

3. SAME—*what does not overcome evidence of delivery.* The facts that deeds are found in the grantor's possession after his death and that he retained possession and control of the property after making the deeds do not overcome evidence of delivery based upon the legal presumption arising from the fact that the deeds were in the nature of a voluntary settlement, and upon the testimony of the notary that after he told the grantor he was conveying his property absolutely the grantor said he knew that fact but had confidence in the grantee, to whom he then handed the deeds.

4. TRUSTS—*when trust is created.* A voluntary conveyance of property by absolute deed upon the parol promise of the grantee to

sell the property and make certain payments after the grantor's death, in accordance with a written but unsigned memorandum prepared by the grantor indicating the names of the beneficiaries and the amounts to be paid to each, creates a trust in favor of the beneficiaries named.

WRIT OF ERROR to the Circuit Court of Cook county; the Hon. LOCKWOOD HONORE, Judge, presiding.

WILLIAM S. HEFFERAN, (EDDY, HALEY & WETTEN, of counsel,) for plaintiff in error.

WINSTON, PAYNE, STRAWN & SHAW, for defendant in error Eugene Sweeney.

WILLIAM DILLON, for defendant in error St. Ignatius College.

M. E. AMES, and FRANK J. WISE, for cross-complainant Mary Aylward.

CHARLES H. PEGLER, for cross-complainant Mary A. Dalton.

Mr. JUSTICE SCOTT delivered the opinion of the court:

Peter Rourke, late of the county of Cook, in this State, departed this life, intestate, at his residence in the city of Chicago, on the 12th day of December, 1903, leaving no widow and no descendants but survived by certain collateral heirs. On February 6, 1905, John Ward, one of his heirs-at-law, filed a bill in the circuit court of Cook county against the other heirs-at-law of the deceased and against Eugene Sweeney and others, for the partition of two certain tracts of real estate located in Chicago, which are specifically described in the bill but which for convenience are referred to, respectively, as the "south side property" and the "west side property." Certain of the other heirs-at-law filed cross-bills. Answers and replications were filed and upon a hearing before the chancellor the bill was dismissed for want of

equity.   Ward has sued out of this court a writ of error
for the purpose of having the decree dismissing the bill re-
viewed.

The only question for determination is whether the cir-
cuit court erred in holding that two deeds executed by
Peter Rourke, purporting to convey to Eugene Sweeney the
property described in the bill, were delivered by Rourke, in
his lifetime, to Sweeney in such manner as to vest the title
to the real estate in Sweeney.

Peter Rourke had been married to an aunt of Sweeney's.
She died something more than a year prior to the death of
her husband.   They never had children.   Sweeney lived
with them in Chicago from the time he was eighteen years
of age until he was thirty-three years of age, when he mar-
ried.   After Sweeney's marriage, which occurred in 1887,
he took up his residence elsewhere in the city, but his re-
lations with Mr. and Mrs. Rourke continued most intimate,
confidential and affectionate.   Rourke regarded the relation
existing between himself and Sweeney as that of parent and
child, and frequently referred to Sweeney as "my boy."
Shortly after the death of Mrs. Rourke, and on August 15,
1902, Rourke caused John T. McEnery, a notary public, to
call at his residence on the west side property in question
and to prepare for execution three warranty deeds from
Rourke to Sweeney.   McEnery testifies that Rourke, who
was then quite ill, stated that he desired to deed the prop-
erty to Sweeney for the reason that Sweeney had been good
to him and his wife and that he (Rourke) wanted to pay
him.   Rourke, Sweeney and McEnery were the only per-
sons present.   After the deeds were prepared they were
immediately executed, and at the time of their execution
McEnery asked Rourke if he knew that he was deeding his
property to Sweeney absolutely and that it remained for
Sweeney to carry out the conditions upon which the con-
veyances were made.   Rourke replied that he understood
the transaction thoroughly, knew what he was doing, had

confidence in Sweeney, and stated that the latter would carry out his suggestions. After the deeds were executed and McEnery had attached the acknowledgments, Rourke, at McEnery's suggestion, handed the deeds to Sweeney, saying, "These are the deeds to my property which I give to you." Sweeney accepted them and still had possession of them when McEnery left the house, a little later. One of these deeds conveyed the south side property, another the west side property, and the third, real estate which is known as the Fulton street property. Neither reserved any right to the grantor. On the occasion of the execution of the deeds, and prior to the time they were signed, Rourke told McEnery, in Sweeney's presence, that Sweeney was to sell the west side property and out of the proceeds thereof was to make certain payments. Sweeney indicated his assent, and such sale and payments were the conditions to which reference was had in the conversation between Rourke and McEnery, above referred to. These conditions were evidenced by a writing which was prepared at the same time, which stated:

"I, Peter Rourke, desire Eugene Sweeney, in whom I have vested title, to sell my property," [and then follows a description of the west side property,] and out of the "proceeds of said sale I desire the following bequests: To Mary E. Rourke, for education and support, $5000; to St. Ignatius College, in trust for Holy Family Church for the repose of souls of Ellen Rourke, my wife, and myself, $4000; Mary Danaher, Sr., $1000; Eugene Sweeney, Sr., $1000; Catherine Dalton, $1000; St. Vincent's Orphan Asylum, $500; to Little Sisters of the Poor, $500; to erection of tombstone and curbing and keeping in repair lot in Calvary Cemetery, $2000. I desire to have the amount allotted to St. Ignatius College, for masses and the amount allowed for Calvary Cemetery to be given in full, without any deduction whatever.

*August 15, 1902.* .................................

"Subscribed and sworn to before me. .
[Seal.]            JOHN T. McENERY, *Notary Public.*"

This memorandum was not signed by Rourke, for the reason that he, Sweeney and McEnery, upon consultation,

thought that if he did so it might be regarded as a will, and he did not desire to execute an instrument of that character. The record does not certainly show what was done with this paper after it was prepared. Sweeney seems to have produced it upon the trial. The aggregate of the sums mentioned in the memorandum, it will be observed, is $15,000, and the west side property seems to have been worth about $18,000. The deed for the Fulton street property was recorded within a few days after its execution, and that property is not here in controversy. After the death of Peter Rourke the other two deeds were found, unrecorded, in a tin box belonging to him, in his residence. Sweeney took possession of them and placed them on record. Sweeney has made no attempt to convey the west side property. By his answer he avers that it is his intention to sell and convey that property and from the proceeds to pay the items mentioned in the written memorandum above referred to so far as they remain unpaid, and avers that except for threatened litigation he would long since have pursued that course. It appears that he has sold the south side property and has made some payments on account of the items in the memorandum. After the execution of the deeds Rourke continued in possession of the two properties in controversy up to the time of his death, collected rents, paid taxes, etc., and negotiated with intending purchasers for the sale of both pieces of real estate. In one instance, however, where the negotiations indicated that a sale might result, he referred the party with whom he was dealing to Sweeney. Evidence of various of Rourke's friends was offered, from which it appears that Rourke was very much affected by the loss of his wife; that following that event his own health was poor and he believed his death was not far distant. In conversations after her death and prior to the execution of the deeds he several times expressed his purpose to "make over" or transfer his property to Sweeney as a reward for the latter's kindness to himself and wife.

It is contended by plaintiff in error that even if there was a physical, manual delivery of the deeds, it was not the intention of the parties thereto that the title should pass, and that Rourke until his death exercised such control over the said deeds as enabled him to recall the same. It is, of course, true that the mere fact that a deed is handed by the grantor to the grantee does not necessarily show such a delivery as passes title, and if it was not Rourke's intention, at the time he handed these deeds to Sweeney, to vest the title in the latter, but merely passed the deeds to him for some other purpose and regained dominion over them after the notary had withdrawn and thereafter never delivered them, no title would pass. (*Elliott* v. *Murray,* 225 Ill. 107, and cases there cited.) The undisputed testimony of McEnery, however, shows that at the time of the execution of the deeds, in language that amounted to a warning, he said to Rourke that he was conveying the property to Sweeney absolutely; that Mr. Rourke stated that he was aware of that fact, expressed confidence in Sweeney and thereafter delivered the deeds to him. The memorandum that he had prepared for the purpose of signing, but which he did not sign lest it should be regarded as a will, stated that he vested the title to the west side property in Sweeney, and this is the property $15,000 of the proceeds of which was to pass in accordance with the memorandum. Rourke evidently intended to make a voluntary settlement of his property upon Sweeney. In such case there is a stronger presumption in favor of the delivery of the deeds than in the ordinary case of a conveyance for a valuable consideration. *Valter* v. *Blavka,* 195 Ill. 610; *Chapin* v. *Nott,* 203 id. 341; *Henry* v. *Henry,* 215 id. 205.

We think the presumption of the delivery of the deeds, aided, as it is, by the testimony of McEnery, is not overcome by the fact that the deeds were afterwards returned to Rourke's possession and that he continued to exercise dominion over the property up to the time of his death.

Rourke was sick and aged at the time the deeds were executed and contemplated an early demise. Thereafter he lived for more than a year. The return of the deeds to him and his enjoyment and dominion over the property may as well be attributed to some agreement made after the deeds were executed and passed to Sweeney as to a prior arrangement. All three of the deeds were delivered in the same manner and under precisely the same circumstances. The delivery of all was one transaction. There is no question but that the Fulton street property passed, and yet, so far as the mere question of delivery is concerned, there is precisely the same evidence as to each deed. If the title vested in Sweeney upon delivery of the deeds, as we think it did, a subsequent understanding, by virtue of which the possession of the deeds was returned to Rourke with an agreement that the latter, so long as he lived, was to control the property precisely as before the execution of the deeds, would not divest Sweeney's title.

It is contended, however, that even if it be conceded that the deeds were delivered without any present purpose that they should be returned, the evidence leads to the conclusion that the arrangement was ambulatory in character, and that it is therefore not operative because Rourke's purposes were not declared by a writing signed and witnessed in conformity to the statute relative to wills. It is insisted that the language of the memorandum itself indicates, by the use of the word "bequests" and by the character of certain of the proposed gifts, that the various amounts specified were to be paid only upon Rourke's death, and that as to the persons and institutions to whom such sums were to be paid the arrangement was testamentary in character. It must be remembered that Rourke desired to avoid making a will and did not sign the memorandum lest it should be regarded as an instrument of that kind. It is clear, however, that the sale and payments mentioned in the memorandum were to be made only after Rourke's death. In

*Stahl* v. *Stahl,* 214 Ill. 131, we held that where a mother conveyed the legal title to land to one son to hold the same for the benefit of himself and her other children, the conveyance being without valuable consideration and resulting from the confidence reposed by the mother in the son, a court of equity would impress upon the property a constructive trust in favor of the children other than the grantee, notwithstanding the agreement rested in parol. In *Oswald* v. *Caldwell,* 225 Ill. 224, it was said (p. 231): "We have no question but that a party may make and deliver an absolute deed to real estate, intending thereby to divest himself of title, with the understanding with the grantee that he will sell and dispose of the real estate so conveyed, subsequent to the death of the grantor, and divide the proceeds arising from such sale between such persons as the grantor may subsequently designate in writing or by will, and that if such trust is evidenced by an independent writing signed by the grantee, or is admitted by the grantee in a writing signed by him, as it was in this case, the trust will be enforced in equity. It must, however, appear that the title to the real estate vested in the grantee during the life of the grantor, and if such fact does not appear the trust would not be enforced." It is true that in the case at bar Sweeney's agreement to sell the west side property and distribute the proceeds in the manner directed by the written memorandum was not evidenced by an independent writing signed by him, but under the authority of *Stahl* v. *Stahl, supra,* in view of the confidential relation existing between the grantor and the grantee, the promise of the latter could be enforced even though it rests only in parol, and we think that the arrangement between him and Rourke is to be regarded as one creating a trust, by contract, in favor of the persons and institutions mentioned in the memorandum, and not as a testamentary provision made for them by Rourke.

The decree of the circuit court will be affirmed.

*Decree affirmed.*