HATCH v. HATCH et al.

No. 2623.   Decided August 29, 1914.   Rehearing Denied May 8, 1915
(148 Pac. 433).

1. DEEDS—CONVEYANCE BY FATHER TO SON—UNDUE INFLUENCE—
   PRESUMPTION.  Where a voluntary conveyance was made by
   testator to his son at the instigation of the mother, the relation-
   ship between the parties gave rise to no presumption of undue
   influence to cast upon defendants the burden of showing the
   good faith of the transaction.[1]  (Page 227.)

2. DEEDS—DEED TO SON—UNDUE INFLUENCE—SUFFICIENCY OF EVI-
   DENCE.  In an action to cancel a conveyance from father to son,
   made at the instigation of the mother, evidence *held* insufficient
   to show her undue influence.[2]  (Page 229.)

3. DEEDS—INCAPACITY OF GRANTOR—SUFFICIENCY OF EVIDENCE.  In
   an action to cancel a conveyance alleged to have been made by
   one without capacity, evidence *held* insufficient to authorize
   finding of lack of capacity existing at time of conveyance.[3]
   (Page 230.)

4. CONTRACTS—"MENTAL CAPACITY"—STATUTE.  Comp. Laws 1907,
   section 4001, providing that the phrases, "incompetent," "men-
   tally incompetent," and "incapable," as used in the title (which
   regulates the appointment of guardians for incompetents), shall
   be construed to mean any person who, though not insane, is
   by reason of old age, disease, weakness of mind, or from any
   other cause, unable, unassisted, properly to manage and take
   care of himself or his property, and by reason thereof would be
   likely to be deceived or imposed upon by designing persons,
   does not alter the ordinary test of contractual capacity, which

[1]*Corporation of L. D. S.* v. *Watson*, 25 Utah, 45, 69 Pac. 531, dis-
tinguished.

[2]*Chadd* v. *Moser*, 25 Utah, 378, 71 Pac. 870; *Anderson* v. *Anderson*,
43 Utah, 26, 134 Pac. 553.

[3]*Chadd* v. *Moser*, 25 Utah, 378, 71 Pac. 870.

is impairment of the mental faculties to such an extent that the subject has not power to comprehend the matter of the contract, its nature and probable consequences, and to act with discretion in relation thereto, or to the ordinary affairs of life. (Page 230.)

5. DEEDS—DELIVERY—PRESUMPTION. Where a deed was recorded, the grantee going into and remaining in possession, and grantor survived the making of the deed for about three and one-half years without questioning its validity or delivery, a presumption of delivery arose. (Page 231.)

6. DEEDS—VALIDITY—UNDUE INFLUENCE—EVIDENCE. In an action to cancel a deed alleged to have been procured by undue influence, two deeds, previously executed by the same grantor, one to another grantee, and one to the same grantee, reserving a life estate in the grantor, were properly admitted in evidence to show some reason for making the deed in question. (Page 231.)

7. EXECUTORS AND ADMINISTRATORS—CONVEYANCE OF TESTATOR—UNDER INFLUENCE—DUTY OF EXECUTOR. It is the duty of an executor to bring suit to cancel his testator's conveyances thought to have been procured by undue influence in order to conserve the estate. (Page 232.)

Appeal from District Court, Fourth District; Hon. *A. B. Morgan*, Judge.

Action by Abram C. Hatch, as executor, against Edwin D. Hatch and others.

Judgment for defendants. Plaintiff appeals.

AFFIRMED.

*E. A. Walton, Chase Hatch* and *J. W. N. Whitecotton* for appellant.

*W. W. Ray* and *J. L. Rawlins* for respondents.

FRICK, J.

Abram C. Hatch, as executor of the last will and testament of his father, Abram Hatch, deceased, brought this action to cancel two deeds by which the deceased had conveyed to the respondent Edwin D. Hatch, a son of the deceased, and a half-brother of Abram C. Hatch, certain lands alleged and

proved to be of the value of $6,000. The respondent Vernico Burton Hatch is the wife of Edwin, and Ruth Hatch is his mother. Ruth Hatch was the second wife of the deceased. The grounds for which the validity of the deeds is assailed are mental incapacity of the grantor and undue influence practiced upon him by Ruth Hatch, his wife. The pleadings are very long, containing many statements of evidentiary facts. The allegations of want of mental capacity and undue influence were denied, and the case was presented upon those issues.

One of the deeds was executed on the 31st day of January, 1908, by which the deceased conveyed fifteen acres to his son Edwin D. Hatch, and the other one was executed on the 1st day of June, 1908, by which he conveyed ninety acres adjoining the fifteen acres to the same son. It seems there had been two prior deeds executed by the deceased, one in 1900 and the other in 1903, one of which was made to another of his sons, a full brother of Edwin D. Hatch, and one to Edwin D., reserving à life estate, however, in the grantor, and which deeds have some bearing upon the questions involved. The deeds, and the terms thereof, are referred to by the witness Willis as will hereafter more fully appear.

It was made to appear from the evidence that both the plaintiff, Abram C. Hatch, and respondent, Ruth Hatch, were duly appointed executor and executrix of the last will of the deceased, which was executed by him on the 22d day of November, 1902, and after his death was duly admitted to probate. Abram C. Hatch, however, alone instituted this action for the reason that Ruth Hatch refused to join as a plaintiff, and therefore she was made a defendant.

The deceased departed this life on the 2d day of December, 1911, at the age of eighty-two years. He was married twice, and practically reared two families, and at his death left surviving him five children by his first wife, and five by Ruth Hatch, his second wife, who is his widow. The evidence is quite voluminous, and is principally directed to the mental condition of the deceased during the last few years of his life. We have carefully read the evidence, all of which is carefully preserved in the bill of exceptions. It is not

practical to set forth here even a synopsis of the evidence, as to do so would make this opinion entirely too long. There is much evidence to the effect that during the last five or six years preceding his death the deceased suffered lapses of memory to the extent that in the same conversation he would ask the same question two or three times. A doctor, a grandson of the deceased, testified that his failing memory and his general mental condition was the result of a disease known as "arterial sclerosis," which, he said, caused a "hardening of the arteries," which resulted in what the doctor called attacks of epilepsy, or what are commonly called epileptic fits. It was shown that the deceased had several of such attacks, the first one along in 1906 and several more thereafter during the later years of his life. Indeed, it is contended that he suffered an attack the day or evening preceding the 1st day of June, 1908, the day the last deed in question here was executed, but from some other evidence the court was justified in entertaining some doubt with regard to that question. It was also made to appear that usually an attack would produce unconsciousness which would at times last for several hours, and that the attacks would affect the deceased's mind more or less for some time thereafter. A large number of witnesses testified with respect to the mental condition of the deceased, but we think the deductions from the facts detailed in the evidence are perhaps best reflected from the testimony of Abram C. Hatch, the plaintiff, the oldest son of the deceased, and who now is and for many years has been one of the prominent lawyers of this state and this court, and who for many years was connected in business with the deceased. In fact, their business relations continued to within a very short time before the latter's death. After the witness had stated the facts at considerable length he also stated his opinion, or made the following deductions from the facts. We copy his statements in that regard from the bill of exceptions as follows:

"There were times between 1906 and 1909 when his mind was much better than it was at other times, and I would say that at times during that period from 1906 up to 1909—up to December, 1908, I will put it—he might have been compe-

tent to transact ordinary business with which he was acquainted, and other times for quite lengthy periods of times when he was, in my opinion, absolutely incompetent; then from on or about December, 1908, until his death there were very great differences in his condition of mind. He had these attacks. I don't know what they were. During the attacks he was unconscious, and after it was reported that he had another attack, it was considerable time before he was what I would call rational, so that he could do business at all. And from 1904—I would say the latter part of 1903—I noticed from the latter part of 1903 that he was at times unfit and incompetent to transact business, but I will say that in my judgment from 1905 he was in a condition so that any one in whom he had confidence might have over-reached him in a business transaction very well, very easily.''

After a careful reading of all the statements made by this and other witnesses, I am impressed, as no doubt was the trial court, that the deductions and conclusions of the witness respecting the mental condition of the deceased at the time the deed was executed are stronger than the facts warrant.

Mr. Willis, also a lawyer, and who prepared and acknowledged the deed of June 1, 1908, was also called as a witness for the plaintiff. In view that we shall not set forth any other evidence, we shall quote somewhat freely from the evidence of this witness. It was made to appear that for twenty years or more the deceased maintained a business office in connection with his dwelling, and that much of his business was by him transacted there. It further appears that Mrs. Ruth Hatch asked Mr. Willis to prepare the deed in question and to bring it with him to the deceased's office or home and have it executed there. Mr. Willis prepared the deed, taking the description of the land from other deeds which he had theretofore prepared for the deceased, and on the morning of the 1st day of June, 1908, took it to the home of the deceased to have it executed. The witness states what transpired at that time in the following words:

''Mrs. Hatch never employed me as an attorney herself; she did employ me as attorney for Mr. Hatch. I could not say the exact date without looking at the books, but it was about

1907. I took it that I was employed as a general attorney. I was employed to make collections and to institute suits in the courts on those collections. I prepared complaints, and Mr. Hatch signed them. Mr. Hatch appeared to know right at the time what he was at. I think that he understood what he was doing right up to the time of his death. I think that he understood transactions done through me right at the time. He had, as lots of people do, a failing of memory somewhat as people do when they grow older. I suppose he understood what he was doing when he executed those deeds, but I had reason to think otherwise from what he said afterwards. Right at the time he executed these deeds I think he knew what he was doing, and I accordingly took his acknowledgment, and I certified in that acknowledgment that he duly acknowledged to the execution of that deed. The conversation I had with him after the execution of that deed relating to the ninety-acre tract, the question of whether it included the fifteen acres or not, did not come up because that had been conveyed at a previous time. I don't think the deeds were executed at the same time. I remember two deeds. I would have to go to my books to refresh my recollection as to whether there were two deeds made at this time, but my recollection is that the deed to the fifteen acres was made some three months before. I would not be certain of the same. I made two deeds for him to what I understood to include the Priestly farm; one of them was for a fifteen-acre tract, and the other was for ninety acres. I think both tracts are called the Priestly farm. After signing the deed Mrs. Hatch went out of the room and Mr. Hatch said to me, 'Willis, what can I do for you?' And I told him that I came there to have him sign a deed, and that he had signed it. He asked me what the deed was, and what property it was for. I explained it, and he apparently understood it. Mrs. Hatch stated at that time that it was in fulfillment of arrangements made long prior to that time; she made that explanation to Mr. Hatch at the time or just prior to his signing the ninety-acre tract of land, and that prior transaction was called to his attention by her, but not the fifteen-acre tract. Mrs. Hatch explained to him prior to his signing that it was in pursuance of an agreement

made long prior to that time, by which this farm, upon a certain contingency, was to be conveyed to Ed. I presume he understood it from her explanation. Mr. Hatch signed the deed after her explanation. I can give the substance of that explanation. It was that there had been some agreement or some understanding between Mr. Hatch and Mrs. Hatch at least, and perhaps the boys—I couldn't say as to that—that Ed. was to have certain property or certain land, and that Vermont was to have certain land, and that this Priestly farm was conveyed to Ed. in an equity proposition in the dividing up of certain lands between the boys. The question that came up was the explanation that Mrs. Hatch made to Abram Hatch as to why this deed should be signed for the ninety-acre tract. I have been acquainted with Abram Hatch all my life, and know all of his sons. I can't say of my own knowledge about his executing deeds of lands to his sons after they became of age and got married. Mr. Hatch never told me that he had conveyed lands to his other sons. That wasn't the subject of conversation at the time of the making of the Priestly farm deed. At that time Mr. Hatch asked me what he could do for me after the signing of the deed. He referred to the boys, and which boys he meant I don't know. He said he wanted the boys provided for, but there was no explanation as to who he meant. I would not like to say as to that thought being uppermost in his mind; it would be a conclusion. I would not say that he wanted the boys provided for. I don't think he told me about deeding farms to his older children.''

Mr. Turner, the husband of one of the deceased's daughters by his first wife, also testified on part of the plaintiff. He said he was present at the home of the deceased on the morning of June 1, 1908, when the deed of that date was executed; that Mrs. Ruth Hatch in his presence asked the deceased to sign the deed, and he heard her tell him, ''Well, you promised it to him,''.meaning that the deceased had promised to convey the lands described in the deed called the Priestly farm in the evidence to the respondent, Edwin D. Hatch, aforesaid. It seems the witness did not remain in the house to see the deed executed.

The books kept by the deceased, in which he recorded his banking transactions, were produced in evidence by the plaintiff to show that during the later years of his life, and from about 1906 on, the greater part of the entries made in them were in the handwriting of Mrs. Ruth Hatch, and that there are but few entries in the handwriting of the deceased, and none after October 14, 1909. It was also shown that the deceased frequently consulted with Mrs. Ruth Hatch concerning his business affairs and transactions, and that he had great confidence in her ability and judgment. It was not shown, however, that the deceased was not directing the keeping of the books aforesaid, and that he did not finally determine for himself whether he would or would not consummate any particular business transaction or transactions.

Quite a number of witnesses testified that from their acquaintance with the habits and conduct of the deceased he was not competent to transact important business during the later years of his life, including the year 1908, without assistance from some one. Upon the other hand, there is much direct evidence, which is not questioned by any one, to the effect that during all of the years up to and including 1910, the deceased was constantly engaged in large and various business enterprises; that he was a director and vice president of a bank, and that he always discharged his official duties the same as other officials; that he was a director in a number of commercial corporations, and that he generally discharged his official duties in connection with his associates in those corporations; that in the year 1908 he made several loans, one at least for $2,000; that he determined the character of the security for this loan, and decided for himself whether to make it or not after a personal inspection of the proposed security; that another loan of $1,000 was made by him in the same manner, and that the note, which was produced in evidence, was in his own handwriting; that he bought and sold personal property and refused to purchase some property offered to him after examining the same; that he conducted his banking affairs, making almost daily deposits, and he either made out the deposit slips himself or directed one of the bank employees

to do it for him, he, however, checking over the items with care; that he entered into at least one contract whereby he gave an option of purchase on some of his real estate, and when the option was taken up executed the deed therefor; that he made affidavits correcting and explaining his former official records. Indeed, it is apparent from the whole testimony that he, during 1908-10 transacted quite as much important business, perhaps more than does the average business man of his years, or some who are much younger than he was. It was also made to appear that within three days after the deed of June 1, 1908, was made he came to Salt Lake City from Heber City, his home, a distance of eighty miles or more, to perform the marriage ceremony of his grandson, Dr. Hatch. It is true that it was made to appear that he became somewhat confused in performing the marriage ceremony, in that he did not seem to remember the name of the bride, with whom he was, however, not acquainted, and in omitting to tell the young couple to join hands before commencing the ceremony, and in not remembering some other portions of the ceremony as printed in the book. He, however, completed the ceremony finally, and it would seem that if the question of the validity of the deeds had not arisen, no one would have thought the old man was mentally incompetent for the reason that he seems to have had a similar difficulty at some prior marriage ceremony. We remark, further, that most all of the witnesses directed at least the principal part of their testimony to things occurring during the last few years of the deceased's life, and after the year 1908, when the deeds were made.

It was also made to appear that the deceased was a man of very vigorous mentality, and, generally speaking, strong and healthy, and a man who always had conducted varied and large business enterprises. His two sons, the plaintiff and another son, it seems were, for many years, connected with their father in his business enterprises, and that was also true of a son-in-law, Mr. Turner. Nearly all, if not all, of the children of the first wife were thus directly engaged with their father in a number at least of his many business enter-

prises, while the children of the second marriage were not thus engaged with him.

From the last will of the deceased it appears, however, that he bequeathed the great bulk of his property, the bequests amounting to nearly $100,000, to Mrs. Ruth Hatch and to her five children. The remainder of the property, which the inventory shows was valued at approximately $20,000, he divided, share and share alike, among all of his ten children.

The District Court, after hearing all of the evidence, made findings of fact in which he found the issues in favor of respondents and entered a judgment dismissing the complaint. Abram C. Hatch as executor, hereinafter called appellant, alone appeals, and asks us to reverse the findings and judgment and make findings and enter a decree according to the prayer of his complaint.

It is contended that under the evidence the findings and judgment should have been in favor of appellant. In this connection it is urged that the court erred in holding that the burden of proof was on appellant to establish the alleged undue influence practiced upon the deceased. Appellant contends that he made out a *prima facie* case of want of mental capacity and of undue influence, and therefore, by virtue of the relationship existing between the deceased and Mrs. Ruth Hatch, the burden was cast upon the respondents to show the *bona fides* and fairness of the transaction. Among the cases cited by appellant which he contends sustains the foregoing proposition respecting the burden of proof are the following: *Piercy* v. *Piercy,* 18 Cal. App. 751, 124 Pac. 561; *Cole* v. *Getzinger,* 96 Wis. 559, 71 N. W. 75; *Mors* v. *Peterson,* 261 Ill. 532, 104 N. E. 216; *Allore* v. *Jewell,* 94 U. S. 506, 24 L. Ed. 260; *Kennedy* v. *Currie,* 3 Wash. 442, 28 Pac. 1028; *Corporation of L. D. S.* v. *Watson,* 25 Utah 45, 69 Pac. 531; *Archer* v. *Archer,* 8 N. Y. St. Rep. 477; *Yosti* v. *Laughran,* 49 Mo. 594; *Barnard* v. *Gantz,* 140 N. Y. 249, 35 N. E. 430; *Paulus* v. *Reed,* 121 Iowa 224, 96 N. W. 757. We have carefully read all of the foregoing cases, as well as other cases cited by appellant in support of the foregoing proposition. Without pausing here to review and distinguish them, it must suffice to say that none of them, in

our judgment, is in point or applicable to the facts of the case at bar. Indeed, wherever the rule is stated by the courts in any of the foregoing cases, it is apparent that the burden of proof to sustain a deed made by the husband or father is not cast upon the wife or a child under circumstances' like those in the case at bar. This is clearly made to appear in the case of *Barnard* v. *Gantz, supra,* wherein the rule is stated on pages 256, 257, 35 N. E. 430. In *Chidester* v. *Turnbull,* 117 Iowa 168, 90 N. W. 583, the same question that is presented here was presented. Counsel there contended, as is contended here, that the conveyance being voluntary, the burden was cast on the grantee, the son of the grantor, to prove that the grant was the uninfluenced and voluntary act of the father. The Supreme Court of Iowa, however, stated the law to be otherwise. The rule is stated at page 170 of 117 Iowa, at page 583 of 90 N. W. in the following words:

"Counsel for plaintiffs contend that the burden is on the defendant, Thomas Turnbull, to prove that the conveyance to him by his father was not procured by means of undue influence or imposition for which the relations of the parties gave opportunity, but this is not true. We have recently held that the fact that a voluntary conveyance is made from father to son while the father is residing in the son's family, even though the conveyance deprives other children of their proportionate share in the father's property, is not presumptively fraudulent, and will not throw on the grantee the burden of proving the want of undue influence. The owner of property has a right to dispose of it during his lifetime as he sees fit, even though his act may, in itself, seem to be unfair and unreasonable with reference to the interest of other children than the one to whom the conveyance is made."

The Supreme Court of California, in the case of *In re Langford,* 108 Cal. at page 622, 41 Pac. at page 705, disposes of the contention with respect to the burden of proof as follows:

"It is sought to distinguish the case at bar from the McDevitt Case, 95 Cal. 17 (30 Pac. 101), because in the case at bar there was the relation of husband and wife; and the position seems to be taken that such relation raises the presumption of undue influence. But there is no such presumption. 'There is no legal presumption against the validity of any provision which a husband may make in a wife's favor, for she may justly influence the making of her husband's will for her own benefit, or that of others, so long as she

does not act fraudulently, or extort benefits from her husband when he is not in condition to exercise his faculties as a free agent. *Latham* v. *Udell,* 38 Mich. 238. Accordingly, the circumstance that the testator's wife urged upon him the propriety of leaving his property to her does not constitute undue influence to vitiate the will. *Hughes* v. *Murtha,* 32 N. J. Eq. 288. And the mere fact that 'the will of the husband is changed to gratify the wishes of the wife dos not raise a presumption of undue influence on her part. *Rankin* v. *Rankin,* 61 Mo. 295.' "

Apart from the evidence that Mrs. Ruth Hatch, to a large extent, made entries in the books kept by the deceased, that she was at times consulted by him and others respecting his business affairs, and that she requested the deceased to make the deed of June 1, 1908, there is no direct or indirect evidence in this record from which anyone can legitimately deduce or infer undue influence upon her part. And there is not a scintilla of evidence, it may be said, that Edwin D. Hatch, grantee, ever even attempted to induce either the mother or the deceased to make the deed in his favor. As is intimated by the Supreme Court of California, if the courts should interfere in a transaction between husband and wife, or between those of parent and child, every time it is shown that the wife asked, or even coaxed, the husband to transfer property either to her or to one of the children of both of them, all such transactions must of necessity cease. Such, fortunately, is not the law; and the courts have frequently so declared. The following cases are all well considered, and in most of them the facts are much stronger in favor of both mental incapacity and undue influence than in the case at bar, and yet the appellate courts have either affirmed the judgments of the lower courts in sustaining the transactions, or they have reversed the lower courts where such courts have set them aside. We specially refer to the following cases, namely: *Bishop* v. *Hilliard,* 227 Ill. 382, 81 N. E. 403; *Dick* v. *Albers,* 243 Ill. 231, 90 N. E. 683, 134 Am. St. Rep. 369; *McLeod* v. *McLeod,* 145 Ala. 269, 40 South, 414, 117 Am. St. Rep. 41; *Teegarden* v. *Lewis, Adm'r,* 145 Ind. 98, 44 N. E. 9; *Sears* v. *Vaughan,* 230 Ill. 572, 82 N. E. 881; *Slaughter* v. *McManigal,* 138 Iowa, 643, 116 N. W. 726; *Dean* v. *Dean,* 42 Or. 290, 70 Pac. 1039; *Blakeley* v. *Blakeley,* 33 N. J. Eq.

502.  See, also *Chadd* v. *Moser,* 25 Utah, where the present
Chief Justice, at page 378, 71 Pac. 870, practically lays down
the same rule.  See, also, *Anderson* v. *Anderson,* 43 Utah, 26,
134 Pac. 553, where the rule respecting the quantum of proof
necessary to establish undue influence is stated.  Many more
cases could be cited, but we refrain from doing so because the
foregoing clearly illustrate the principle involved.  In nearly
all, if not all, of the foregoing cases (excepting those cited
from Utah) the question of what constitutes a fiduciary relat-
tion or one of such trust and confidence as ordinarily will
cast the burden of proof on the beneficiary of a particular
transaction is fully discussed.  It is made very clear that un-
der circumstances like those in the case at bar there is no such
fiduciary relation of trust and confidence as will cast the bur-
den of proof upon the beneficiary under a deed or a will.
The relation of parent and child or husband and wife does
not, in and of itself, create any such presumption.

Nor is the evidence sufficient to authorize a finding that the
deceased, at the time he made the deeds in question,
was not possessed of sufficient mental capacity to make       **3, 4**
valid conveyances of his property.  The test of mental
capacity applied to contracts by practically all the courts is
well stated by the Supreme Court of Indiana in *Teegarden* v.
*Lewis, Adm'r, supra,* at page 101, in the following words:

"In ordinary contracts the test is, Were the mental faculties so
deficient or impaired that there was not sufficient power to compre-
hend the subject of the contract, its nature and its probable conse-
quences, and to act with discretion in relation thereto, or with re-
lation to the ordinary affairs of life?"

In nearly all of the cases last above cited the question of
mental capacity was also involved and passed on by the courts.
The courts generally, as will be seen, approve of the test out-
lined by the Supreme Court of Indiana.  This is true of this
court.  See *Chadd* v. *Moser, supra.*

Nor does Comp. Laws 1907, Section 4001, referred to by
counsel for appellant, change the test.  To hold that under
all the facts and circumstances disclosed by the record before
us the deceased did not possess the necessary mental capacity
to enter into and execute ordinary contracts affecting property

and property rights would result in laying down a rule whereby most all of the transactions of aged men and women who had some mental defects could be successfully assailed in courts of equity. No general or hard and fast rule which shall govern or control in all cases can be promulgated, but every case must, to a very large extent, be determined upon the facts and circumstaces present in that case. All that we can say, therefore, is that in this case the findings and conclusions of the trial court in refusing to set aside the deeds in question upon the ground of undue influence and want of mental capacity are not only clearly sustained by the evidence, but, in our judgment, the findings and judgment are in accord with the great weight of the evidence.

It is also insisted that the deeds, or, at least the one made June 1, 1908, was not delivered. The deed, after it was signed by the deceased and his wife, was, by Mr. Willis, taken to his office, where he wrote the certificate of acknowledgment and attached his notarial seal, after which he took it back to the home of the deceased and handed it to Mrs. Ruth Hatch, one of the grantors. The deed was thereafter duly recorded, and the grantee went into possession some time thereafter, and has remained in possession under the deed ever since. The deceased survived the making of the deed for about $3\frac{1}{2}$ years, and transacted business, as we have seen, but never questioned the validity of the deed or the delivery thereof. Under such circumstances there arises a presumption of delivery, and under the authorities this presumption must prevail. 13 Ballard, Law of Real Property, Section 145; *Ward* v. *Conklin,* 232 Ill. 553, 83 N. E. 1058; *Beardslee* v. *Reeves,* 76 Mich. 661, 43 N. W. 677; Jones on Evidence (2d Ed.), Section 50.

It is further contended that the court erred in admitting the two deeds executed in 1900 and 1903, and which were referred to by the witness Willis in his testimony. These deeds were admitted for the sole purpose of showing some reason or cause for making the deed of June 1, 1908. For the purpose of throwing some light upon the transaction involved here they were clearly proper. See *Beardslee* v.

*Reeves, supra,* where a similar contention is passed on adversely to appellant's contention.

Much stress is also laid upon the fact that the deceased bequeathed about five-sixths of the property he died possessed of to his wife, Ruth Hatch, and to the five children he had by her. It is contended that this disposition is an unnatural one, and hence sheds some light upon the question of Ruth Hatch's influence over the deceased. That such a contention is unsound under facts like those in this case is clearly demonstrated by the Supreme Court of California in the case of *In re Langford, supra.* As we have pointed out, nearly all if not all, of the children of the first marriage were directly interested in and connected with the business affairs of the deceased. In such enterprises they were either partners or · joint stockholders. We cannot tell what the value of such interests was. It may well be that each one of the children of the first marriage may possess as much, perhaps more, property than do those of the second marriage. The disposition made by the deceased may therefore have been just and equitable, although by the will he may have given to the children of the second marriage much more than he gave to those of the first marriage. But supposing it to be otherwise, the question was one which he alone had the right to determine, and if he did so in the full possession of all of his faculties and without being unduly influenced or coerced, his judgment in that regard, and not that of others, not excepting the courts, must prevail.

Counsel for appellant have urged upon us one or two other matters, but in view that, although we should sustain counsel in their contentions, the result would still have to be the same, it is not necessary for use to consider them.

We remark that we do no wish to be understood by anything we have said or omitted to say that this action was brought without cause. Upon the contrary, we say that, under the circumstances, if appellant thought the deeds in question were not valid, it was his duty in his representative capacity to bring an action to determine that question just as was done. What we hold is that the

evidence in this case is wholly insufficient to warrant a court of equity to set aside the deeds or either of them.

The judgment is therefore affirmed. It is further ordered that the costs be paid out of the decedent's estate.

McCARTY, C. J., and STRAUP, J., concur.