## ANDERSON v. THOMAS.

No. 6798. Decided June 5, 1945. (159 P. 2d 142.)

See 26 C. J. S., Deeds, sec. 211; 16 Am. Jur., 651.

*A. H. Christenson,* of Provo, and *Dilworth Woolley,* of Manti, for appellant.

*Larson & Larson,* of Manti, for respondent.

WOLFE, Justice.

During her lifetime Cecilia Thomas executed and delivered two deeds to her son, Richard, in which he was named as grantee. This is a suit brought by Daniel J. Anderson, as administrator of the estate of Cecilia Thomas, deceased, to cancel these two deeds. The plaintiff in substance alleged (1) that at the time of the execution of the deeds, the grantor, Cecilia Thomas, did not have the mental capacity to understand the nature and legal effect of her acts and therefore did not have sufficient mental capacity to make the deeds; and (2) that in making the deeds the grantor was acting under dominating influence of the grantee, her son, so that the deeds were not the product of her own mind and will. The court found against the plaintiff on both propositions and entered judgment in favor of the defendant. From this judgment the plaintiff appeals.

By assignment of error the plaintiff contends that the trial court erred in finding that Mrs. Thomas had the mental capacity to make a deed and in finding that the deeds were not made under the influence of any one but were her free and voluntary act. It is also urged that the trial court erred in certain particulars in ruling on the admissibility of evidence. We turn first to the contention that the evidence preponderates against the findings made by the trial court.

Since this is an equity case, we have made a complete review of the facts as revealed by the record. One of the

deeds in question was dated July 12, 1941, and recorded November 25, 1941. The other was dated August 19, 1941, and recorded March 21, 1942, two days after the death of the grantor. By these deeds the grantor divested herself of substantially all of her property. She retained only her home and a small sum of money on deposit in a bank. One deed conveyed approximately 62 acres of land, together with water rights, forest grazing permits and some livestock. The other conveyed approximately 75 acres of land, some water rights, and livestock and other personal property. At the time of the conveyance of these two tracts of land and at the time of her death, the grantor had seven children. Some of these children testified that Mrs. Thomas had indicated that they were to share equally in her property. The court found from the undisputed evidence that the transfer to Richard was without consideration "other than the natural love and affection and perhaps appreciation for care and filial attention." The grantor was 86 years old at the time of her death. She was failing in health and almost totally blind. It appears that in 1941 she grieved considerably over the recent death of one of her sons. It thus appears that Mrs. Thomas would have been a person who could have been easily imposed upon. The fact that Richard, who lived in the same home with Mrs. Thomas, obtained substantially all of her property just a few months before her death and in effect disinherited six other children is the strongest evidence in support of the contention that there was undue influence. However, these circumstances alone are not sufficient to show undue influence. The plaintiff must do more than merely raise a suspicion. There must be some affirmative evidence to show that Richard did exercise a dominating influence over this mother and thus induced her to part with her property. Such affirmative evidence is almost totally lacking here.

The evidence adduced by the plaintiff was nebulous and for the most part remote in time from the date of the signing of the deeds. Most of it related to transactions and

conversations which occurred in 1937, four years before the deeds were executed. In determining whether or not the grantor had sufficient mental capacity to execute a deed, the focal point of the inquiry is the condition of the grantor's mind at the time of the execution of the deed. Less weight is given to remote transactions and conversations. Laying aside this factor, however, the testimony adduced on behalf of the plaintiff still falls far short of showing a lack of mental capacity or undue influence.

To support the contention that the record shows a lack of mental capacity, reference is made to the fact that Mrs. Thomas' attorney aided in the control of her bank deposit from late in 1937 until the time of her death. Regarding this arrangement her attorney, J. S. Christensen, testified that she came to him and told him that she

" 'had certain money in the Bank of Ephraim and because of my eyesight, I can't see to write checks or who writes the checks, I would like you to tell the bank not to let my money go out without your approval,' and I told her that I would be glad to help her in that respect if she wanted me to. She said 'I would like to have it done, and I would like to have you or someone you know sign as a witness when I do get money so that no one else but myself gets the money out.' "

Witness Christensen testified that the arrangement was made at her suggestion and request. All the witnesses admitted that she knew the value of money and was careful to protect it. Another matter in connection with her control of money is of interest. Whenever she withdrew money from the bank she took it in five dollar bills. This was because she could not see the denomination of the bills and by having currency only in five dollar denominations she always was able to tell how much money she had. Her method of handling money certainly does not indicate mental incompetency.

Plaintiff refers in his brief to evidence that Mrs. Thomas frequently could not recognize people who called to visit her including some of her own children. It is clear, how-

ever, that this failure to recognize people was not due to mental incompetency, but rather because of her failing eyesight. Any inference to the contrary finds no support in the record. As soon as she was told the name of the particular persons calling to see her she was able to identify them and understand who they were. One daughter testified that Mrs. Thomas was very childish and when asked for an example stated that Mrs. Thomas would not come to meals when called but waited for some one to take her by the arm and lead her to the table. However, a subsequent witness, in explaining the various ways in which Mrs. Thomas objectively manifested that she was blind, stated that she often would not come to the table for her meals unless someone took her by the arm and guided her there. It therefore appears likely that the so-called childishness stemmed from her blindness rather than from a failing of her mind. Testimony given to show mental anxiety, nervousness and lapse of memory was of the same inconclusive character.

Balanced against this evidence of the plaintiff is the positive testimony of several witnesses who were in almost constant business and social contact with Mrs. Thomas and who were present at the time of the signing of the deeds. Among these witnesses for the defendant were: His sister, Cecilia Draper, who lived in the same house with Mrs. Thomas, her mother, and cared for her constantly for several months prior to the execution of the deeds; an attorney, J. C. Christensen, who prepared one of the deeds and who represented Mrs. Thomas in her legal affairs from 1937 until the date of her death; A. J. Rees, a neighbor and notary public called in to witness the execution of one deed; Theodore E. Rees, notary public and neighbor, called in to notarize the deed of July 12th; Walter Hanson, who married the granddaughter of Mrs. Thomas and was administrator of the estate of Rosser Thomas, a son of Mrs. Thomas. Rosser Thomas died in June of 1941. The property covered by one of the deeds to the defendant was previously owned by Rosser Thomas. When Rosser died, all of his

property descended to Mrs. Thomas as his sole heir. Witness Walter Hanson was, at the request of Mrs. Thomas, acting as administrator of the Estate of Rosser Thomas, deceased, during the time both deeds to defendant were signed by Mrs. Thomas. He was present during the signing of the August 19th deed and signed it as a witness. He testified that Mrs. Thomas often expressed a desire to have Rosser's property go to Richard.

Most of these witnesses were not directly interested in the outcome of the suit. Cecilia Draper should naturally have been hostile to Richard for she was one of the children of Mrs. Thomas disinherited by the giving of the deeds to Richard. Yet she testified that Mrs. Thomas was intelligent and in full possession of her mental facilities when she signed both deeds. She also testified that Mrs. Thomas explained as her reason for giving the property to Richard, that Richard had worked all of his life on the farms without compensation and that after Rosser died, Mrs. Thomas desired to have the farms go to Richard.

J. C. Christensen, the attorney for Mrs. Thomas, testified that she appeared to be perfectly normal when she signed the August 19th deed; that he had told Mrs. Thomas to hold on to her property and distribute it by making a will, but that Mrs. Thomas had replied that she had some money and that Richard would look after her. He also testified that in his opinion Mrs. Thomas fully understood what she was doing when she made out the deeds.

The other two witnesses, Theodore and A. J. Rees, who notarized the signature on the deeds, both testified that Mrs. Thomas expressed her desire to have the property go to Richard, that she understood that the deeds would accomplish that purpose. Both testified that she apparently was normal in her conversations and that there was nothing to give any indication that she was not in full control of her mental facilities.

In the face of this positive testimony, given to a large

extent by disinterested witnesses, it cannot be held that the trial court erred in finding that Mrs. Thomas knew the nature and legal effects of her acts. The test for determining whether a person had mental capacity to contract was stated as follows by this court in *Hatch* v. *Hatch*, 46 Utah 218, 148 P. 433, 438:

"In ordinary contracts the test is, Were the mental facilities so deficient or impaired that there was not sufficient power to comprehend the subject of the contract, its nature and its probable consequences, and to act with discretion in relation thereto, or with relation to the ordinary affairs of life?"

We see no reason why the same test should not apply to determine whether or not a grantor has sufficient mental capacity to make a deed. See also *First National Bank* v. *Headrick*, 19 Okl. 164, 121 P. 2d 566. The evidence does not under this test show mental incompetency.

No one testified to anything that would indicate that Richard was bringing pressure to bear on his mother to effect the transfer of this property to him. Cecilia Draper who was almost constantly with her mother for two or three months immediately prior to the execution of the first deed, and with her at the time both deeds were executed, testified that Richard had not imposed upon his mother. The only evidence, other than the factors noted above (the mother giving all of her property to one son to the exclusion of six other children, her age, failing health, etc.), which even indicates that Richard did bring pressure to bear is the testimony of one daughter to the effect that in 1937 the mother stated that the other children must not cross Richard or he might kill himself. A statement so remote in time and so unrelated to the transfer of the property to Richard is entitled to little weight. The plaintiff failed to show undue influence. The court correctly so found.

This leaves only the questions relating to rulings on the admission and exclusion of evidence. The principal con-

tention in this regard is that the trial court erred in permitting J. S. Christensen, attorney for Mrs. Thomas, to testify regarding business transactions with her. ▪ The basis of the objection to this testimony is the communications between Mrs. Thomas and her attorney were privileged and therefore inadmissible, the claim of privilege being raised by the administrator of the estate of Mrs. Thomas. The objection to this testimony is based on Section 104-49-3 (2), U. C. A. 1943, which prohibits an attorney from testifying about any "communication made by the client to him" without the client's consent. It is almost uniformly held that this prohibition does not apply where the communication between the attorney and client takes place in the presence of a third party. See *Ver Bryck* v. *Luby,* Cal. App., 155 P. 2d 706; *Ludwig* v. *Mont. Bank & Trust Co.,* 109 Mont. 477, 98 P. 2d 377; Wigmore on Evidence, 3rd Ed., sec. 2311. Substantially all of the communications testified to by Mrs. Thomas' attorney came within this class.

It must also be noted that here the attorney was one of the attesting witnesses to the August 19th deed. As noted by Wigmore, Section 2315:

"When the attorney is made a witness to attest the execution of a document (and not merely to draft it), there is no confidence contemplated, and therefore no privilege for the occasion when the attorney is called upon to fulfill the function thereby assumed * * *. Accordingly, it has always been held that an attorney who signs in attestation of a deed is compellable to testify."

The testimony of the attorney relating to the execution of the deed, the conversations had at that time, etc., was therefore admissible, for he was an attesting witness. However, the attestation is of course no waiver for prior distinct communications. *Hardy* v. *Martin,* 150 Cal. 341, 89 P. 111.

The testimony regarding the arrangement with Mrs. Thomas for the withdrawal of money from the bank would not have been admissible under either of the principles noted above. It was a transaction distinct from the execution

of the deed and it does not appear that the arrangement was made in the presence of third parties. The case of *In re Young's Estate*, 33 Utah 382, 94 P. 731, 17 L. R. A., N. S., 108, 126 Am. St. Rep. 843, 14 Ann. Cas. 596, is cited as authority for the admission of all of the testimony of the attorney. That case involved a wills contest and we held that the privilege did not apply. The reasons for the holding are discussed at length and we believe the opinion to be sound. But it does not appear that even in a will contest case the attorney can testify regarding distinct professional transactions totally unrelated to the preparation of the will.

We believe, however, that the testimony regarding the arrangement for drawing out the money was admissible on this theory: Section 104-49-3 (2) only prohibits communications between an attorney and client when the communication is *in the course of professional* ▮▮▮▮▮ *employment*. It applies because the client, when he seeks professional legal advice, often knows that he must divulge all of the facts to his attorney. The law will not permit any one to use the statements so made as a weapon against the client. The mere fact that the relationship of attorney and client exists between two individuals does not ipso facto make all communications between them confidential. As noted in Wigmore on Evidence, Section 2311,

"No express request for secrecy, to be sure, is necessary; but the mere relation of attorney and client does not raise a presumption of confidentiality, and the circumstances are to indicate whether by implication the communication was of a sort intended to be confidential. These circumstances will of course vary in individual cases, and the ruling must therefore depend much on the case in hand."

The client in this case expressly instructed the attorney to notify the bank of the arrangement and the signing of the check would further publicize it. It is doubtful that she even approached him in the the course of professional employment, or that this was ever intended to be a confidential relationship. Further, even if this testimony regarding the arrangement for withdrawing money were

excluded, there was still sufficient evidence to compel the conclusion that Mrs.. Thomas was of sound mind at the time of the execution of the deed.

We conclude that all of the testimony given by J. S. Christensen, attorney for Mrs. Thomas, was properly admitted either (1) as having been related to communications given in the presence of third parties; (2) as relating to the execution of the deed to which he was an attesting witness; or (3) as not being a communication in the course of professional employment which Mrs. Thomas desired to have confidential.

Objection is made to the exclusion of two letters which recite that they were written by Mrs. Anderson, a daughter of Mrs. Thomas, at Mrs. Thomas' request. They were apparently written in answer to letters written to Mrs. Thomas by her attorney and related to the ▪ appointment of a guardian and division of the estate of the deceased husband of Mrs. Thomas. Mrs. Anderson was not called to identify the letters nor to testify that Mrs. Thomas had requested her to write them. There· thus was no competent evidence that they were with Mrs. Thomas' approval or at her request. In the absence of such testimony and identification they were hearsay. Further they were written in 1937. They did not contain anything to indicate that Mrs. Thomas was of unsound mind or that she was being dominated by anyone. If they had any materiality, it was slight and they would have been entitled to little weight. It is true that other similar letters were admitted, but they were identified by the writer and no objection was made as to them. There was no error in this regard.

The only other matter which we deem it necessary to discuss is the contention that witness Ephraim Thomas should have been permitted to state whether or not Cecilia Draper had told him that the reason Mrs. Thomas gave the deeds to Richard was that she (Mrs. ▪ Thomas) feared Richard would commit suicide if she didn't. This was offered solely for the purpose of impeach-

ment. It was objected to as an attempt to impeach on an immaterial matter. Mrs. Draper testified at length, but was never asked whether or not she ever made such a statement to her brother, Ephraim. There is some doubt, therefore that a proper foundation was laid for impeachment on this point. Assuming a proper foundation it would appear that this would not be an attempt to impeach on an immaterial point. The whole inquiry was directed to the reasons for the making of the deeds. Mrs. Draper had given one reason, to wit: that Richard had worked on the place and Mrs. Thomas thought he should have it. If Mrs. Draper had on some other occasion stated that the reason for the execution of the deeds was that Mrs. Thomas had feared that Richard would kill himself if he did not get the deeds, it would be proper impeachment. However, this evidence, if admitted, could not have changed the result. The preponderance of the evidence is too clearly in favor of the position taken by the defendant.

Judgment affirmed. Costs to respondent.

LARSON, C. J., and McDONOUGH and WADE, JJ., concur.

TURNER, Justice (concurring).

I concur in the result and agree with the statements of law set forth in the opinion but cannot say that I view the evidence with the same favor as Mr. Justice Wolfe.

I have read the transcript and have studied the ruling of the trial judge with considerable care. It is evident from the record that this case was tried with considerable patience. The trial court was consistent in its rulings and the trial from the beginning to the end was conducted fairly and impartially. The record is free from reversible error. Because of this and the advantage the trial court has over this court in weighing the testimony and in passing upon the credibility of the witnesses, I feel compelled to concur and sustain the judgment of the trial court.

I cannot say, from having read the record, that I believe

as Mr. Justice Wolfe, that the defendant produced a great preponderance of the evidence. True it is, that copy of testimony of defendant's witnesses covers far more pages than that of the plaintiff's, but it is weight of evidence that controls, not mere volume. But for the conclusions of the trial court, I would say I think more of the plaintiff's case than the defendant's in view of all the circumstances. Not having seen the witnesses and had the opportunity to observe them while testifying, I am in doubt as to which of the witnesses deserves most consideration.

Mr. Justice Wolfe states that the fact that Richard, who lived in the same home with Mrs. Thomas, obtained substantially all of her property just a few months before her death and in effect disinherited six other children is the strongest evidence in support of the contention that there was undue influence. I agree with this but do not concur with the following inference that aside from this the evidence of the plaintiff's merely raises a suspicion. A complete picture shows that this aged lady at eighty-two, when her husband's estate was being settled was most insistant that her son, a step-son of the deceased husband, be given the same share as the other children even if it had to come from her interest. From the record I would conclude that up until a year of her death, Mrs. Thomas was determined that no one would influence her to make a will or dispose of her property so as to benefit one child as against another except that for years she had determined that the family home was to pass to her sons, John, Richard and Rosser.

But with Rosser's death conditions apparently changed. Either the son's death or the influence of others changed this old lady's mind. The legal question presented to the court is: Did Mrs. Thomas of her own mind make these deeds or did the influence of some one else take control of her faculties and cause her to act as she otherwise would not have done?

I think courts should accept wills and conveyances made by the extremely aged or severely ill with great caution.

It is universally known that serious illness and age wear down both body and mind. Wills and conveyances, generally speaking, should be made before the final turn, the time when it becomes apparent that there is no hope for recovery. In every land and in many families there are some so saturated with greed that they, like vultures, watch the sick and dying and await the opportune time to strike and take everything possible. Greed has no regard for justice or decency. Courts should lend no encouragement to people of such character. It is much better that property be distributed according to statutory law than have the courts give invitation or approval to undue influence and greed.