325 P.2d 839

Charles E. RICHMOND, Executor of the Estate of Wm. B. Outcalt, Deceased, Plaintiff and Respondent,

v.

Ivie W. BALLARD, Defendant and Appellant.

No. 8755.

Supreme Court of Utah.

May 26, 1958.

Grant Macfarlane, Grant Macfarlane, Jr., Salt Lake City, for appellant.

Marr, Wilkins & Cannon, Salt Lake City, for respondent.

WORTHEN, Justice.

The action was commenced to set aside a quitclaim deed obtained by Ivie W. Ballard from the deceased. The complaint is grounded upon the decedent's advanced age and debilitated mental capacity and the exercise by defendant of undue influence on the deceased.

The case was tried to the court sitting without a jury. Judgment was entered for plaintiff and defendant's motion for a new trial was denied.

On September 30, 1954, the date the deed in question was executed, William B. Outcalt was 86 years old. He had no living blood relatives. His wife had died in 1950. In March, 1953, Mr. Outcalt was

operated on for partial removal of an incurable tumor. On May 2, 1953, he executed a will in which he left his estate to the widow of his nephew, Annie C. Brooke. Plaintiff, Charles E. Richmond, was named executor and the will was witnessed by the wife of plaintiff, Esther M. Richmond, and Lillian D. McConnell.

Defendant took care of Mr. Outcalt for a short period in July and August of 1952. She was there constantly from December 24, 1953, until the date of his death on March 9, 1956. However, Mr. Outcalt had tried for many months prior to December 24, 1953, to induce defendant to come and live with him and take care of him. She stayed with him at the request of Mrs. Richmond the night before Mr. Outcalt went to the hospital in March, 1953. Before March, 1953, Mr. Outcalt had called on defendant in an effort to get her to come and stay and she had intended to stay with him on his return from the hospital in March, 1953. But she testified that while Mr. Outcalt was in the hospital the McConnells and the Richmonds treated her pretty rotten and when Mr. Outcalt was about ready to come home Mrs. Annie C. Brooke called and told her that they would have to have a nurse and that she was not capable of taking care of him. It further appears that defendant went to the home of Mr. Outcalt sometime after his operation to return the key, and Mr. Outcalt told defendant that he had overheard the conversations by the Richmonds and the McConnells while he was sick and that he wasn't pleased with it and added, "I'm going to work until I get you back." "It is my business and I've got to be taken care of. My money is my own." There is testimony that Mr. Outcalt told defendant that he had $4,000 and more that he could get hold of and told her what property he had and said that he needed defendant and if she would come and live with him until his death she was to have all that was left after payment of his funeral expenses. Defendant suggested that he make the same proposition to the Richmonds and Mrs. Brooke. There is testimony that Mrs. Brooke wanted him in a home. Defendant said she didn't want to come unless he couldn't get anyone else. Mrs. Ballard was called by plaintiff and examined about the codicil to his will. It is stated in respondents' brief:

"Mrs. Ivie W. Ballard, the defendant and appellant took care of him for a short time in July and August of 1952 (Tr. 183). She again went to his house to care for him December 24, 1953, and he continued under her care until his death March 9, 1956 (Tr. 183). *However, they were some time making arrangements for her to stay. Prior to the final arrangements, she talked to him many times about a will or codicil (Tr. 183). She learned at that time he had approximately $5,000.00 in money or valid obligations owing to him* (Tr.

300). *She suggested that* they go to Mr. Macfarlane, her attorney, *to have the codicil drawn* which they did in October 1953 (Tr. 184). She and Mr. Outcalt went to Mr. Macfarlane's office in October to discuss the matter (Tr. 188). Sometime after October 12, she picked up a draft of the instrument (Tr. 188). The draft was returned to Mr. Macfarlane December 24, 1953 (Tr. 189). *This was the day on which she started to take care of him.* She testified that the *draft was corrected by Mr. Outcalt in his own handwriting* (Tr. 189, Exhibit 17). (We do not admit the corrections to be in his handwriting.) The codicil was signed in Mr. Macfarlane's office December 31, 1953 (Tr. 190, Exhibit 5). The codicil provided that Annie C. Brooke should receive his household and personal effects. The residue of the estate was left to Ivie Ballard under certain conditions. These conditions were as follows:

" ' * * * on condition, however, that she personally attend to my desires and needs for the remainder of my life; all expenses to be taken first from my funds and in the event they are exhausted then from the personal funds of said Ivie Ballard.

" 'If this condition be not fulfilled, this devise shall lapse and the portion of my residue so alloted [sic] shall pass to Annie C. Brooke or her heirs. The determination of whether Ivie Ballard has fulfilled the above mentioned condition shall rest exclusively with my executor hereinafter named.'

"Walker Bank and Trust Company was named as executor."

We have given this background in order to better understand events occurring subsequent to defendant's entry upon her duties on December 24, 1953.

The record discloses that defendant received checks drawn by Mr. Outcalt and by Mr. and Mrs. Richmond. The first check was for $25 and was dated January 9, 1954, and was signed by Mr. Outcalt. All checks signed by Mr. Outcalt had no notation as to what the checks were for. The checks written by Mr. Richmond carried the notation "Salary." Checks in varying amounts from $25 to $100 were paid Mrs. Ballard each month. The plaintiff testified that Mr. Outcalt made the determination as to how much Ivie Ballard was to receive.

There is no suggestion that the amount of money paid Mrs. Ballard was in lieu of the arrangements consummated in the codicil. There is evidence that after the codicil was executed on December 31, 1953, it was placed in an envelope and Mr. Outcalt wrote Mrs. Ballard's name on it in his own handwriting and Mr. Outcalt and Mrs. Ballard went to the Continental Bank and put it in a safety deposit box in her name.

About ten months later or a little earlier Mr. Outcalt suggested that she get it out and put it in her room to avoid having to pay for the safety deposit box for another year. Mrs. Ballard testified that while the codicil was in her room the sealed envelope which held the codicil was broken, and that when asked who had been there that day, Mr. Outcalt said that no one had except Mrs. Richmond. The record discloses that Mrs. Ballard fully and faithfully discharged her obligations to Mr. Outcalt as required under the codicil.

On January 4, 1954, just four days after signing the codicil, Mr. Outcalt purportedly executed an olographic will, which was found in a safety deposit box at the Sugarhouse Branch of Walker Bank and Trust Co. Defendant did not know of the execution of the olographic will until after the death of Mr. Outcalt. The olographic will provided in part as follows:

"I authorize and empower my executor hereinafter named, to sell and dispose of any and all personal or real property without orders or direction of any court having jurisdiction of my estate."

"*First:* I give, devise and bequeath to my niece, Annie C. Brooke, of Pasadena, California, any and all of my personal effects which she may choose at the time of my death.

"*Second:* I give, devise and bequeath to said Annie C. Brooke, one-third of the residue of my estate.

"*Third:* I give, devise and bequeath to my friend, Ivie Ballard, of Salt Lake City, Utah, one-third of the residue of my estate for services she has rendered me.

"*Fourth:* I direct that my executor pay to the said Annie C. Brooke, the remaining third of my estate, in trust to be disturbed by her to *a list of my dear and helpful friends whose names I have furnished her with the proportion of said one-third of my estate which I wish paid to each one.*

"I hereby appoint Charles E. Richmond of Salt Lake City, Utah, as the sole executor of this my last will and testament, to serve and act as such without bond. In the event he shall for any reason be unable to act, I hereby appoint Walker Bank and Trust Company, as executor.

"This will is written entirely in my own hand-writing and signed by me this 4th day of January, 1954." (Emphasis added.)

In January of 1954 Mr. Outcalt was operated on for a recurrence of his tumor. His recovery was satisfactory but the tumor began to recur in May. During the months

of July and August, 1954, he was very ill and was on heavy dosages of drugs which were necessary for him to get his sleep at night. Dr. John S. Marshall, his personal physician, testified that in the latter part of July and August of 1954 he used a chemical to dissolve the tumor. "The tumor was dissolved in part and his pain gradually lessened so that he was taking less drugs in August and able to take more food and nourishment and gradually improved in strength. He was very feeble during August, however."

Dr. Marshall testified that Mr. Outcalt was a little stronger in September, 1954; that he came upstairs to his bedroom about the 1st of September and he was convalescing during the month of September and was able to move about the house.

Asked about defendant's duties and care of Mr. Outcalt during his serious illness of July and August Dr. Marshall said:

"She prepared all his meals, fed him, spoon feeding him most of the time, take care of the house. She kept it very tidy and very nice. Changed his bed frequently. He was prior to this illness you see he was off his catheter. He did not have his catheter prior to his serious illness in July. However, when he became more and more bedfast he began to soil the bed. So she was having to change his bedroom many times during the day and keep it laundered. * * *"

Defendant testified that when his illness recurred in July, 1954, he was in the basement; that her care increased tremendously; that he had no control of his bladder; that she washed 14 sheets in the bathtub in one day; there were no washing facilities. She was there night and day. On September 2, 1954, he moved upstairs. Asked about his physical condition in September she said "Well he gradually was getting better and was able to walk a little and into the living room." She testified that from September 21, 1954, the day he executed two deeds conveying property to Siggard, he was improving till Christmastime.

With respect to the execution of the quitclaim deed, Exhibit 1, defendant testified, that on the morning of the 30th day of September, 1954, she had been waiting on Mr. Outcalt and she was leaving and when she got to the door he called her and said "come back, I want to talk to you"; "I want you to have this house more than anybody, more than anybody else in this world" and he said, "I'm going to see that you get it; because you have proved to me that you have done more for me than anybody else has done or would do for me," and he said "I want you to promise, I'm getting this deed made out today, and I want you to promise, will you stay with me until I die or go" and that she said "Yes, I will." Then Mr. Outcalt asked her to get the quitclaim deed, his tax notice and his glasses; that he looked over the papers and said "Now I

want you to take this to someone to type it. Do you know of anyone?" and she answered "Yes, I know Mrs. Dent." *About 10:00 or 10:30* defendant took the bus up to Mrs. Dent's and requested her to type the deed. She typed it and defendant returned and gave it to Mr. Outcalt. He looked it over and said, "It's okeh" and he signed his name to the deed and again said "I want you to have this, you have done more for me than anyone in the world." Defendant testified that she called her daughter who came in her car and took Mrs. Ballard to the home of Mrs. Luchesi, the notary. Mrs. Luzchesi told her that the deed would have to be witnessed and that her daughter would not do. Mrs. Ballard went to the home of Mr. George E. Dent and he went with defendant to the home of Mrs. Luchesi, and Mr. Dent signed as a witness and Mrs. Luchesi acknowledged the signature. She then returned and gave the deed to Mr. Outcalt. He looked it over and said "It's okeh." He put the deed in an envelope and handed it to Mrs. Ballard and he took her hand again and told her he wanted her to have that for what she had done for him, and that she had done for him what no one else had done. She further testified that he said he didn't want Mrs. Brooke to have it; that she hadn't done anything for him. He said, "You have earned it and you deserve it." He said that Mrs. Brooke was no blood relative of his and that "she could buy you and I out several times, I don't owe her any-

thing and I don't owe the Richmonds anything, but they think they own me." Mrs. Ballard testified that Mr. Outcalt said: "You keep this in your presence always until I go" and then he said, "You can have it recorded. * * *"

Mrs. Richmond testified that Exhibits 11 and 12, a letter and an envelope were found by her on March 17, 1956, eight days after Mr. Outcalt died, in the drawer of Mr. Outcalt's desk in his bedroom. She testified that the desk had only one drawer and that the envelope was sealed and carried the following direction, "To be opened immediately after my death"; that she opened the envelope and read the contents; that the envelope contained a letter to the executor of his estate.

The letter, Exhibit 11, is as follows:

"Dec. 1, 1954

"To the administrator
    of my estate:

"Please settle my estate according to the terms of my olographic will written and signed by me last January. The provisions of this will are just to all concerned and I wish them carried out, ignoring and cancelling all other papers which I may have signed under undue pressure and fear of being left alone."

"William B. Outcalt"

The trial court admitted Exhibit 11 and found that the quitclaim deed was procured by undue influence and entered judgment

decreeing that the quitclaim deed dated September 30, 1954, is null and void and of no force or effect whatever.

Defendant appeals, assigning the following points:

1. The admission of Exhibit 11 is prejudicial error.

2. The finding that the deed was procured by undue influence is against the clear weight of the evidence.

3. Plaintiff is not entitled to equitable relief.

Considering defendant's first assignment of error we are of the opinion that said exhibit was inadmissible.

At the time Exhibits 11 and 12 were offered counsel for defendant asked opposing counsel to state the purpose for which the exhibits were offered, and counsel for plaintiff stated:

"Now it is our contention that this is a statement by deceased which indicates that *exhibit 1 was signed under pressure and fear of being left alone* and that it is evidence of the invalidity of that instrument. The evidence here shows that there is practically no point to the olographic will, if that property is not in the estate. * * * Now there just isn't any estate here unless this deed is cancelled and it is evidence of the invalidity of the September deed."

It should be observed that at the time the deed, Exhibit 1, was executed there was a considerable estate over and above the home conveyed by Exhibit 1. It is conceded that at the time she went to his home to take care of him on December 24, 1953, Mr. Outcalt had about $5,000 cash, and that the heaviest disbursements from his estate came between September 30, 1954, and the date of his death.

The trial court before admitting Exhibit 11 made the following observation:

"* * * You see this is a statement of the deceased. The very issue in this case is whether or not he was imposed upon or whether he knew what he was doing. That is the issue. *Now can there be better evidence than what his own mind was by his own statement?* Now if a witness were testifying that he had said that of course, true, they couldn't *testify as to whether or not that was his state of mind.* They could only testify that that is what he said was his state of mind. It seems to me that where the issue is as to that mental status of the deceased and that is the very crux of this case and you have a statement by him in writing, about which there is no contest that it was his writing, I don't know how you could get a better insight as to what his mind was than to what he says it was." (Emphasis added.)

The able trial judge apparently accepted the statement of the grantor that all other papers "which I may have signed under undue pressure and fear of being left alone" be ignored and cancelled, was substantive evidence that one paper in particular theretofore signed by him was procured through undue pressure. Decedent's declaration in Exhibit 11 has no relevancy to the issues unless his declaration is true. As so considered it strikes squarely at the hearsay rule.

His statement, ambiguous as to what he referred to, is a declaration of the ultimate fact involved in the action. It is a statement which respondent interprets and construes as indicating that Exhibit 1 was signed under undue pressure. The letter does not disclose the grantor's state of mind as to the grantee.

The trial court's statement; "Now can there be better evidence than what his own mind was by his own statement? * * * I don't know how you could get a better insight as to what his mind was than to what he says it was" if a correct statement of the law would mean that every grantor of a deed could at any time thereafter raise a question as to its validity if he later changed his mind by the simple expedient of stating that he had executed it under undue influence.

Assume that Mr. Outcalt, on December 1, 1954, had filed an action to set aside the deed in question on the ground that it was procured by undue influence.

At the trial he is called as a witness and his lawyer asks this question:

"Mr. Outcalt, will you relate just what happened immediately prior to and at the time of the signing of the deed, Exhibit 1. * * *"

And in answer to the question he said:

"Well Mrs. Ballard came in to take care of my room and she *unduly pressured* me to execute the deed."

It cannot be contended that such testimony was not objectionable. He is not disclosing his mental attitude toward her. Conceded that a statement, oral or in a letter, made by decedent at a time not too remote that reflected his mental attitude toward the grantee or evidenced his view of her intent is admissible. Assume he had stated:

"I am afraid of Mrs. Ballard, she won't let me do anything I want to." or "Mrs. Ballard won't let me think for myself" or "Mrs. Ballard seems determined to live my life for me." "I have no affection for her." "I feel quite attached to her."

Here we have statements evidencing the mental attitude of decedent toward her which may show that she might dominate his will and substitute her will for his, which is the essence of undue influence or undue pressure. However, in Exhibit

11 we have only a bald conclusion and a self-serving declaration of the grantor that he was unduly pressured.

Nor has Exhibit 11 the other requirements indicated by this court in Mower v. Mower [1] as follows:

"  *  *  *  Since delivery is essentially a matter of intent, which intent is to be arrived at from all the facts and surrounding circumstances, we believe the better rule is to include in those facts and circumstances *declarations of the grantor* both before and after the date of the deed, *at least where it appears that* the declarations *are made fairly* and *in the ordinary course of life,* and *not in apparent anticipation of controversy* or *litigation* with reference to the matter discussed, and *in the absence of any bad faith, fraud, or misrepresentation.*  *  *  *" (Emphasis added.)

It needs no argument to conclude that the requirements above specified are not present in Exhibit 11. It was not made in the ordinary course of life; it was made in apparent anticipation of controversy or litigation—the litigation here involved—nor is there absent bad faith, fraud or misrepresentation. Bad faith and fraud are most apparent.

Where undue influence is charged in connection with the execution and delivery of a deed the question is presented as to whether or not another's will was substituted for the will of the grantor whereby the grantor was induced to execute the deed and that it was not his act but the act of a person exerting the undue influence.

■ Except for the self-serving hearsay statement in Exhibit 11 the record is completely lacking of any evidence that the will of Mr. Outcalt was ever dominated by the will of Mrs. Ballard.

Statements of the grantor tending to show that his mind could be easily influenced and that another person dominated him or attempted to dominate him are under proper conditions admissible for the purpose of showing the condition of his mind at the time he made the statement, but the naked statement of a conclusion that grantor was "unduly pressured" is inadmissible because it goes solely to prove the ultimate fact, and, does not go to the condition of the grantor's mind at the time of utterance. The Exhibit in question is not subject to the usual tests of trustworthiness. It was not made in the normal course of events in the grantor's life to show the present condition of his mind. It is nothing more nor less than a bald self-serving hearsay conclusion of the testator and is subject to all the reasons which compel the rejection of hearsay testimony in general.

1. 64 Utah 260, 228 P. 911, 914.

In Wigmore on Evidence, 3rd Edition, Vol. VI, Section 1738, page 119 the author in discussing statements as to Undue Influence or Fraud under the general subject Hearsay observes:

"* * * The chief distinction is between their use as direct *assertion of the external fact of fraud* or undue influence—for here they are met immediately by the Hearsay rule—and their use as indicating (directly or indirectly) a *condition of mind* relevant to the issue—for here they are admissible either as circumstantial evidence or as statements of a mental condition under the present Exception."

"(1) The testator's *assertion that a person,* named or unnamed has procured him by *fraud* or by *pressure* to execute a will or to insert a provision is plainly obnoxious to the Hearsay rule, if offered as evidence that the fact asserted did occur:

"1868, Colt, J., in Shailer v. Bumstead, 99 Mass. 122: 'When used for such purpose, they are mere hearsay, which by reason of the death of the party whose statements are so offered, can never be explained or contradicted by him. Obtained, it may be, by deception or persuasion, and always liable to the infirmities of human recollection, their admission for such purpose would go far to destroy the security which it is essential to preserve;' they are thus inadmissible so far as they form a 'declaration or narrative to show the fact of fraud or undue influence at a previous period.' "

Even assuming however that the letter, Exhibit 11, was properly admitted or that as contended for by respondent the admission if improper did not constitute prejudicial error what does it establish? It does not purport to relate to the deed or any deed. It does not say that any paper was signed under undue pressure. It does not refer to any specific transaction, it does not specify or refer to any definite time, place, circumstance or person. It has no probative value in proving the fact of undue influence, unless we use it, in violation of the Hearsay rule to show the ultimate fact that other papers may have been signed by him and we guess and single out the deed, Exhibit 1, as one of the papers he had in mind, if he had any in mind.

We are likewise of the opinion that the finding that the quitclaim deed was procured by undue influence is against the evidence and cannot be sustained.

The trial court found that Mr. Outcalt did not sign the deed in the presence of the witness whose name appears thereon and that the deed was not signed in the presence of nor acknowledged to the notary public whose name appears thereon and that no person was present at the time the deed was signed except the defendant.

No suggestion was raised at the trial, in the brief of respondent or at the argument before this court, that the deed is not Mr. Outcalt's valid deed unless undue influence was exerted. No question is raised that the signature on the deed is not Mr. Outcalt's signature. It is urged that the signature is very shaky and inferior to any other signatures both before and after September 30, 1954, and we are invited to compare it with his signature on certain other exhibits. We were not asked to compare the signature with the signatures, initials and other writing on certain additional exhibits received in evidence. There does appear to be considerable variation in his different signatures. However, the handwriting of decedent on the birthday card, received in evidence, given defendant on her birthday, January 4, 1955, is fully as shaky if not more so than the signature on Exhibit 1. That birthday card was as follows:

Printed — "May your birthday be bright as a rose * * * and just as perfect too!

Hand Written — Most Sincerely

W.B.O."

In answer to Interrogatory No. 1 as to evidence to be offered to show alleged impaired mental capacity plaintiff answered: "* * * plaintiff will further offer testimony by J. Percy Goddard * * * as a handwriting expert."

However Percy Goddard was not offered as a witness.

The trial court, in Findings of Fact 4 found:

"4. * * * that in July, 1954, said William B. Outcalt became critically ill and was *confined to bed substantially* all of the time; that he was *administered drugs for the purpose of alleviating his pain* and *was given sleeping pills each night;* that there was a period daily *between the time of taking said sleeping pills,* and the *time that he went to sleep that he was incompetent to transact business* and said William B. Outcalt was dependent daily upon Ivie W. Ballard for his needs." (Emphasis added.)

The finding that Mr. Outcalt was confined to his bed substantially all the time finds no support in the evidence. As already appears Dr. Marshall, called by plaintiff, testified that after Outcalt moved upstairs about September 1, 1954, he was much improved and was convalescing and was able to move about the house.

Mr. Richmond gave testimony which might be interpreted as supporting said finding. He testified as follows:

"* * * Then in July of 1954, about the middle of July, he was taken ill again and was in bed for a number of weeks, ranging from the middle of

July to the latter part of September.
* * * "

On the other hand, Mrs. Ballard testified that he moved from the basement on September 2 and walked around the house and received Mrs. Richmond and Mrs. McConnell in the living room on September 22.

Mrs. McConnell testified that Mr. Outcalt was not in bed at the time he signed the deeds to Siggard, the purchaser of other property from Mr. Outcalt. She further testified that she felt that Mr. Outcalt was competent when he executed said deeds on September 22, 1954. She also testified that after he moved upstairs in September 1954 that from that time on his condition improved. The trial court's finding that Mr. Outcalt was given sleeping pills each night finds support in the evidence and there is no evidence that he was given sleeping pills other than at night and there is no evidence that any other drugs or medicine put him to sleep.

Dr. Marshall was asked the following questions and gave the following answers:

"Q. Now you have mentioned, Doctor, the use of pain killing drugs and I believe drugs to make him sleep. Would you describe generally, the drugs that you prescribed *and that he used,* and the amount of drugs? A. He would normally or usually take two capsules of sodium amytal of three grain size, oh around 7:00 in the evening at which time he wished to go to sleep for the night. That dose would be six grains of sodium amytal. Occasionally he would take an additional capsule in the middle of the night and endeavor to sleep until morning. The duration of these drugs is from six to eight hours. If one is in pain you will awake even at a shorter time than that, but with the six hour time interval, as you can see, Mr. Outcalt would awaken in the middle of the night and he would often require a second five grains before morning, so that during the night he would get nine grains of sodium amytal, the pain tablet called percodan, that is a relatively mild pain relieving drug, it is synthetic opiate and was well tolerated by him. He took large amounts of aspirin compounds too.

* * * * * *

"Q. Now relative to the sleeping pills and the dosage you have mentioned is that a relatively heavy dose or a light dose, Doctor? A. That is a whale of a dose.

"Q. That is larger than you normally are required to give a patient? A. Yes sir, it is.

"Q. And that was what was required to put him to sleep? A. Yes sir, it was.

"Q. And who administered these drugs to him, Doctor? A. Mrs. Ballard.

"Q. And she purchased all of the drugs? A. Yes sir, she did.

\* \* \* \* \* \*

"Q. Now Doctor, having in mind the dosages of sleeping pills which were taken by Mr. Outcalt, what would be your opinion as to ability, from the standpoint of mental condition, to transact business, after taking these sleeping pills? A. After two or three hours when the medicine was in full effect I wouldn't think he would be very competent. He had unusual tolerance to these drugs and we assume frequently during the middle of the night when he would still *be groggy but fairly clear mentally* but always the pain from the drug action would be lessened when I saw him. *During the* height of the drug action I wouldn't [think] he would do anything but sleep.

"Q. That is during the height. But there would be a period from the time he took it until his sleep that his mental condition would gradually deteriorate? A. Well, he would be foggy, certainly."

Dr. Marshall gave the following testimony:

"Q. Now did you during the month of September call on Mr. Outcalt frequently? A. Yes sir, I did. I saw him approximately, well I saw him six times in the month.

\* \* \* \* \* .\*

"Q. Did you at that time notice the condition of his mind; whether he was able to carry on the regular affairs of a person in that condition? A. Yes sir, he was as clear as he could be.

\* \* \* \* \* \*

"Q. Did you ever see Mr. Outcalt at anytime during that time that you were his physician when you thought his mind was not clear? A. No sir.

"Q. And alert? A. No sir.

"The Court: Let me understand that.

"Q. His mind was always clear and sharp.

"The Court: Up to the time of his death? A. Yes sir.

\* \* \* \* \* \*

"Q. At any time you acted as a physician for Mr. Outcalt did you ever see him at a time when you felt he was not competent to make a will and dispose of his property? A. No sir, I never saw him when I thought he was incompetent.

"Q. Or that he was not competent to make a deed? A. I never saw him when he was incompetent to make a deed." (Emphasis added.)

Dr. Marshall testified that during the months of July and August 1954 he was very ill and was on heavy dosages of drugs,

which were necessary for him to get his sleep at night. In the latter part of July and August of 1954 the doctor testified that he used a chemical to dissolve the tumor. "This was just an experiment. It was successful. The tumor was dissolved in part and his pain gradually lessened so that he was taking less drugs in August and able to take more food and nourishment and gradually improved in strength. He was very feeble all during August, however."

Dr. Marshall testified:

"Q. Now in September was he moved upstairs, of 1954? A. I don't have an exact time as to when he *was able to negotiate* the stairs, but I think in the latter part of August *he was able to negotiate the stairs well* and came back upstairs and use his bedroom there."

He testified that during September Mr. Outcalt was convalescing.

The record is barren of any evidence that the defendant was able to influence Mr. Outcalt, in the slightest degree, against his will. In fact his actions do not warrant any such conclusion or inference. Certain it is that defendant was unable to substitute her will for the will of decedent.

The theory of respondent, which seemed to convince the trial court, is stated in Finding No. 4 as follows: "That there was a period daily *between the time of*

*taking said sleeping pills and the time that he went to sleep* that he was incompetent to transact business."

But as observed herein, and as disclosed by the testimony of Dr. Marshall, his sleeping pills—the only medicine that is suggested as affording a period of incompetency between being taken and the time of his going to sleep—were always taken in the evening—usually *"around 7:00 in the evening at which time he wished to go to sleep for the night."*

Again the record discloses affirmatively and without any contradiction that the deed was not signed in the evening when he may have been foggy—but was signed between 10 or 10:30 in the morning and 2 p. m.

After Mr. Outcalt asked her to get the deed typed and gave her the tax notice, she testified that she went and had Mrs. Dent type the deed. Mrs. Dent testified that Mrs. Ballard brought the deed in "About early afternoon, or very late morning. It was in the day." After defendant returned with the deed and after Mr. Outcalt signed the same, Mrs. Ballard went and got Mr. Dent to witness the deed. He testified that Mrs. Ballard came to his home around 2 p. m. That when he affixed his signature the typing was all completed and Mr. Outcalt's signature was on the deed.

It was found in Finding of Fact No. 5: "That at the time said William B. Outcalt signed said deed he *either had*

*no knowledge of what he was signing* or said signature was *procured by undue* influence and was not the voluntary or legal act by William B. Outcalt; that at said time said William B. Outcalt was incapable of making a gift *or of entering into any agreement* with respect to said property; that after the signing of said deed until the date of the death of William B. Outcalt he continued under the care of said Ivie W. Ballard, in the same manner, under the same arrangements, and with similar pay as prior to said deed, his physical condition continued to decline and he was incapable of ratifying said deed, if in fact he was aware of what he had signed and said William B. Outcalt did not ratify and confirm the same in his lifetime."

We are of the opinion that Finding No. 5 is not a proper finding. Is it a finding that when Mr. Outcalt signed the deed he had no knowledge of what he was signing, or is it a finding that his signature was procured by undue influence and was not the voluntary or legal act of William B. Outcalt? This is simply a finding that Outcalt either did or did not know what he was signing. The court did not find that when he signed the deed he did not know what he was signing. Neither did the court find that when Outcalt signed the deed he was induced to do so by undue influence.

We are however of the opinion that the finding that deceased had no knowledge of what he was signing if that finding was made or intended to be made, is not supported by the evidence. We are likewise of the opinion that the finding, if such was made, that his signature was procured by undue influence is not supported by the evidence.

Undue influence must be established by clear and convincing evidence. In Northcrest, Inc., v. Walker Bank and Trust Co.[2] this court, at page 271 of the Utah Report and at page 693 of the Pacific Reporter, said:

"Undisputed is the plaintiff's contention that one who asserts the invalidity of a deed must so prove by clear and convincing evidence."

Not only did the evidence fail to establish that the signature to the deed was procured by undue influence but the finding of undue influence is against the clear weight of the evidence. We are not here confronted with a situation where a confidential relation existed between Mrs. Ballard and decedent. She was not his kin; she was not a volunteer; she was performing services contracted for by Mr. Outcalt and was operating under an arrangement which as heretofore pointed out was worked out over a long period of time, and only after he agreed to and did execute the codicil by which she was to receive all of his

2. 122 Utah 268, 248 P.2d 692.

estate after he had been cared for from his funds and, if exhausted, from her funds. They were dealing at arm's length but during most of the time his arms were the longer. She was a housekeeper and a nurse in the sense that she was available to get his food and his medicine at all hours of the day or night. Plaintiff made clear that defendant was not a trained nurse, either graduate or practical. There is testimony that defendant was requested to come and take care of Mr. Outcalt when he came home from the hospital in the Spring of 1953, and that Mrs. Brooke called her and said "Mrs. Ballard, you are not capable of taking care of Mr. Outcalt and we've got to have a nurse." Defendant did not take care of him on that occasion.

The finding that after signing the deed the physical condition of Mr. Outcalt continued to decline and he was incapable of ratifying said deed, if in fact he was aware of what he had signed, is wholly unsupported by the evidence. The evidence set out heretofore indicates that his condition continued to improve after he moved upstairs and at least until Christmas of 1954. It is strange indeed that Mr. Outcalt was incapable of ratifying the deed but was capable of repudiating the same.

■ As heretofore observed respondent at the time Exhibit 11 was offered, and at all times since, contended that "This is a statement by the deceased which indicates that Exhibit 1 was signed under pressure and fear of being left alone and that it is evidence of the invalidity of that instrument."

Not only did Outcalt seek to repudiate his deed by his letter, but in the same exhibit he also repudiated the codicil executed by him and without which defendant would not have entered upon the service.

The most vigorous argument advanced by respondent as proof that Outcalt was under the will and domination of defendant is this observation from respondent's brief:

"Mrs. Ballard was definitely motivated in taking care of Mr. Outcalt, by a pecuniary interest in his property. Before deciding to care for Mr. Outcalt, she determined that he had approximately $5,000.00 in cash or its equivalent besides the residence in which he was living. * * * She procured a codicil of his will which would pay her well, * * *. That she was capable of exerting pressure on Mr. Outcalt is indicated by the fact that she had the codicil drawn by her own attorney, taking possession of the codicil and retaining it until his death. He was not permitted to place it in his safety box where he kept the will which the codicil amended. There is·

no doubt that there was something secretive about it. On January 4, 1954, four days after the signing of the codicil he revoked it by an olographic will. * * *"

It must be observed here that the above is more potent as justification of Outcalt's actions in double crossing defendant than as indicating that defendant was capable of exerting pressure on Outcalt.

The record discloses that when it had been agreed that the codicil would be prepared, that defendant asked him who he wanted and he said he didn't want Cannon. He said "Who do you know?" and she said "I'll have Macfarlane." It is further shown from the record that after the codicil was executed it was placed in an envelope and Mrs. Outcalt wrote Mrs. Ballard's name on it and both went to the Continental Bank and put it in a safety deposit box. Nor was there any contrary evidence on this point.

We are of the opinion that there is not any evidence either direct or circumstantial tending to prove the exercise of undue influence by Mrs. Ballard, unless she is guilty of such influence because she works for and drives a bargain which she considers fair and just.

We cannot subscribe to the proposition that if decedent executed the deed to defendant for fear of being left alone, the same is evidence of undue influence. Nor do we subscribe to the proposition that if he executed the deed because she threatened to leave him it would constitute undue influence. Defendant declined to undertake the care of Outcalt until he had assured her that he would leave all of his property to her in consideration of her staying with him and caring for him for the rest of his life. Defendant stayed with Outcalt till then never knowing that he had double crossed her by executing the olographic will, with or without assistance. It does appear to be a very fine draft and worthy of one more experienced.

Mr. Outcalt pursued a course that can lead to but one conclusion. He was unfair and sought to take from her by the olographic will two-thirds of the estate which he agreed she should have as his part of their agreement. Certain it is that he should not be permitted to deprive her of her vested interest in his estate.

Mr. Outcalt exhibited a high degree of deceit. Four days after the execution of the codicil, the terms of which took several months to arrange, Mr. Outcalt surreptitiously executed the olographic will. He withheld from defendant any notion that she was not fully protected; not only that but on the very day the olographic will bears date, which is defendant's birthday, he gave her a birthday card mostly printed but partly written as follows:

"To a very dear person        (Handwritten)

Some folks grow older       }
With Birthdays, its true,    }    (Printed)
and others grow nice,        }
and dearer—like you          }

　　　Bill"                   (Handwritten)

While Dr. Jekyll is giving her a beautiful and sentimental birthday card Mr. Hyde is attempting to take away what had been provided for in the codicil. The letter of December 1 follows the same pattern of conduct. On September 30 he gave her the deed but two months later, December 1, he writes the letter with or without advice.

Let it be assumed that she had been advised that Outcalt might change his will and leave her less or that she felt that she would be more secure with a deed to the home, and that if he did attempt to leave her less or nothing by changing the will she would still have the home, which was less than she was to get under the codicil. She did no more in procuring the deed than she would have been entitled to do had she known that he had already provided for her to get only one-third of what she was entitled to. It is most probable that had it not been for the letter of December 1 that no suit would have been commenced to set aside the deed. It is somewhat amazing that Mrs. Richmond found the letter in the drawer of the dresser in Mr. Outcalt's bedroom, when it is made to appear by the record that Mrs. Ballard had gone into that same drawer many times in

1955 at Mr. Outcalt's request and had never seen it. It was a large, No. 10, envelope with writing in large letters as follows:

"Important
Please Open Immediately After My Death.

William B. Outcalt"

The question is suggested as to why Mr. Outcalt, if he knew that he had executed the deed under undue influence, didn't demand it back or try to get hold of it, or if necessary, take action to set it aside. The answer is obvious. He didn't want defendant to know that he was reneging because if he had told her that he didn't intend that she have the deed he would likely have been trying to get a new housekeeper. He wanted her to stay believing that she was his sole heir under the codicil and that he wanted her to have the home.

Not only is there no evidence of undue influence, but we have at most a poor suspicion, fed by the fact that others unwilling to take care of him on the same terms figured that because she had an opportunity to get the deed by undue influence she would do so. There was consideration for the deed and but for his underhand acts she would have received the deed and all his estate.

If the deed was executed by Outcalt because of fear of being left alone the same

is not objectionable. He was capable of bargaining and was cagey enough to try through fraud and deception to take back the considerations he had given. Bargaining to avoid being left alone is his right and privilege. That a lonely and ill old man is willing to agree to give part or all of his property to one whom he needs and will stay with him does not show undue influence. No one else was of any help; no one else wanted the burden of his keep and caring for his mess. He had no blood relatives and Mrs. Brooke, his nephew's widow, never offered to care for him. Certain it is that his fear of being left alone disclosed a keen mind and a mind that knew what he wanted. To permit him to be relieved of his solemn deed on a thread of suspicion by a will which becomes of force only when he is unable to feel and sense any fear of being left alone is to open the door to fraud and unconscionable conduct which we should not condone or encourage.

The record is absent of any statement that he wanted the Richmonds, the McConnells, or Mrs. Brooke to receive his property. He did talk to seven of his old friends and neighbors all of whom gave testimony indicating his desire and intention that Mrs. Ballard be well cared for.

Mr. Taylor, a close neighbor for ten years, testified that in 1953 Mr. Outcalt said "He would be glad to give anybody that was reliable the balance of his estate when he died if they would come and take care of him for the rest of his life."

Mrs. West testified that he said while Mrs. Ballard was ill and hospitalized for a short time "I hope Ivie comes back from the hospital and can stay with me as long as I live * * * and I am giving her this place, deeding this place to her if she stays with me until the last." This was in December of 1955, about 3 months before he died. It is disclosed by Mrs. Ballard's testimony that he demanded a promise of her that she would stay with him to the end when the deed was executed.

Mrs. Foster who previously had lived next door to Mr. Outcalt testified: "Well he told me he was thinking about leaving his home to Mrs. Ballard." She, however, could not fix the exact time.

Mr. Outcalt had lived in Romney's apartment about 18 months. Mrs. Romney and her husband visited him about Christmastime of 1954, and she testified that Mr. Outcalt told them that Mrs. Ballard had been very kind to him and had kept things in very good order and that he, "now I don't say whether he said 'I have' or 'I will see to it that Mrs. Ballard is well cared for after my demise.'"

May Markham testified that in the first week of October, 1954, Mr. Outcalt said, "And I have provided for Mrs. Ballard that

she will be well taken care of when I go for her kindness and for her loving care for me."

Mrs. Taylor testified that Mr. Outcalt told her that he had taken care of Mrs. Ballard, "But don't tell the neighbors."

Mrs. West testified that Mrs. Ballard took very good care of Mr. Outcalt; that he always said she was just like an angel to him.

Under questions from the court she testified as follows:

"The Court: Mrs. West, did I understand you to say that this was in December of 1955 that he told you he was deeding this place to Ivie? A. No—it was yes I guess it was, because he died in '56. Yeah, he told me towards the last there.

"The Court: Did he say he had deeded it or was going to? A. No, he said he had. He said he had fixed it so that she could have it.

"The Court: And you were in the house that is now in question when he said that? A. Yes, uh huh.

"The Court: You said something about if she stayed with me or until the end or something? A. Yes, if she stayed with him, seen him through so he wouldn't have to go to a home or a hospital. He dreaded to go out of that home.

"The Court: Well what I am trying to get is did he tell you that he was going to give her a deed or that he had already given it to her. A. He had already give her the deed.

"The Court: Did he say when? A. No, he didn't tell me when and I didn't ask him. He just said that he had so that it is all there was to it. But he seemed to be very grateful in what she had done for him."

It seems clear from the testimony of these friends and neighbors that Mr. Outcalt either had given a deed to Mrs. Ballard or intended doing so. At least the testimony belies the idea that he never did knowingly execute the deed and that it was not his plan to do so. No witness testified that Outcalt had stated that he was going to give the property to any other person or persons nor was there any testimony to the effect that he ever stated that Mrs. Ballard would not get it. In the case of Anderson v. Thomas[3] the grantor was 86 years old at the time she conveyed to her son shortly prior to her death substantially all of her property. She was in failing health and almost blind. There was testimony indicating that the transfer was contrary to her intended disposition of it. There was other circumstantial evidence which it was claimed pointed to undue influence. This court observed:

3. 108 Utah 252, 159 P.2d 142, 144.

"* * * The plaintiff must do more than merely raise a suspicion. There must be some affirmative evidence to show that Richard did exercise a dominating influence over this mother and thus induced her to part with her property. Such affirmative evidence is almost totally lacking here."

In In re Lavelle's Estate [4] this court said:

"* * * 'It likewise is true that a finding of undue influence cannot rest upon mere suspicion. There must be some substantial facts upon which the inferences and deductions are based, and the circumstances relied on should clearly point out the person who it is alleged exercised the undue influence and his acts constituting the alleged undue influence.'"

If this case were to be decided on the basis of the relationship of the parties and the motives and personal interests to be served, it should be observed that the record would afford a much more potent reason for pressure on the part of the Richmonds, the McConnells and Mrs. Brooke.

Mrs. Ballard was getting less by reason of the deed than under the codicil. Mr. Richmond testified that he found the olographic will in Mr. Outcalt's safe deposit box. Mrs. Richmond testified that she found the letter in a desk in his bedroom some days after his death. Respondent presents Mrs. Ballard as a grasping woman interested in advancing her own welfare and a sharp bargainer. On the other hand, it is intimated that the motives of the Richmonds and the McConnells were lilywhite and that they had no self-interest. It is conceded that Mrs. Brooke stood to profit heavily if the deed were voided.

It is established from the testimony that the Richmonds had obtained a loan of $500.-00 from decedent for which only a note without security had been given, and that the McConnells had borrowed $2,500 from the decedent without any security. Mr. Richmond was named executor of the will dated May 2, 1953. Mr. and Mrs. Richmond had a power of attorney to handle all of Outcalt's funds, checking account and savings. The Richmonds and the McConnells were named as beneficiary of almost half of the one-third left in trust for certain friends under the olographic will.

It must be said for Mrs. Ballard that she did attempt to protect herself before entering upon the care of Mr. Outcalt. There was nothing shady or underhanded in her plan. She was interested in knowing that she was not to devote such time to a man 86 years of age and requiring her full care and attention for the fun of it. It is apparent that she had failed to take into consideration the fact that he might try to double cross her.

4. 122 Utah 253, 248 P.2d 372, 378.

362

No problem as to the dead-man statute is presented since plaintiff waived the same by calling defendant as a witness and going into transactions between defendant and the deceased.

In view of what has already been stated, we deem it unnecessary to further discuss defendant's third point.

Judgment reversed with direction to dismiss the action with prejudice.

Each party to bear his own costs.

WADE, J., concurs.

McDONOUGH, C. J., and HENRIOD, J., concur in the result.

CROCKETT, Justice (concurring specially).

 I concur in the main holding of the case that the evidence does not support a finding by clear and convincing evidence that the deed was not made voluntarily. I am not sure but that under the circumstances the trial court could properly receive in evidence the letter Exhibit 11 as having some probative value as to the state of mind of Mr. Outcalt when the deed was executed, which was an issue in the case. But I agree that under the circumstances shown, the letter could not repudiate the deed.